## ESTATE OF ALONZO SMITH, IN TRUST.

APPEAL BY ALFRED P. SMITH, ADMR., FROM THE ORPHANS' COURT OF PHILADELPHIA COUNTY.

Argued January 21, 1891—Decided March 2, 1891.

[To be reported.]

1. When the stock of a corporation is bequeathed in trust for the use of a beneficiary for life with remainder over, surplus profits accumulated during the testator's life, but not divided until after his death, belong to the corpus of his estate, while dividends of earnings made after his death, whether in cash, scrip, or stock, are income and are payable to the life-tenant.

2. The ruling to this effect in Earp's App., 28 Pa. 368, has been steadily maintained without modification or change for more than a third of a century, no subsequent case doubting the authority of that decision, questioning the practicability of the rule it established, or impeaching the soundness of its doctrine: the cases upon this subject reviewed, per Mr. Justice CLARK.

3. Wherefore, if the corporation, after the testator's death, declare a stock dividend, representing earnings capitalized in his lifetime, the new stock, so issued to the trustees under the will, will be principal, and not a part of the income to which the life-tenant is entitled, even though the market value of the original shares be unaffected by the new issue.

4. Market value may aid in the ascertainment of actual value, and therefore is admissible on that issue; but it is the intrinsic value of the shares, to be ascertained from the amount and value of the assets of the corporation at the testator's death, and not the fluctuations of the stock market, that must govern in determining whether the stock dividend represents capital or income.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

Statement of Facts.

No. 94 July Term 1890, Sup. Ct.; court below, No. 418 October Term 1884, O. C.

On June 15, 1889, Alfred Smith and Horace T. Smith, trustees for Alonzo Smith, under the will of Stephen Smith, deceased, filed their final account as such trustees. The paperbooks did not contain a copy of the account. From the adjudication of the auditing judge, it appeared that the trustees debited themselves, inter alia, with the sum of $3,870, profits upon the sale of eighteen shares of stock in the Frankford & Southwark Passenger Railway Company, as principal of the trust estate, and with the sum of $814, the amount of a dividend declared by said railway company upon seventy-four shares of its stock, as income of the trust estate in their hands.

Objections being made by different parties to the form of each of these debits, the auditing judge, ASHMAN, J., filed an adjudication and a re-adjudication, finding in substance the following facts:

The trust arose under the will and codicil of Stephen Smith, who died in 1884, by which instruments that testator gave to the accountants one sixth of his residuary estate, less $10,399.95 and other advancements, with interest, in trust to pay the net income to his son, Alonzo Smith, for life, free from his debts, and after his death the principal to his said son's children living at his death, and to the issue of any deceased children equally and per stirpes. Alonzo Smith died January 12, 1889, leaving two children, Laura M. and Mary E. Smith, both minors and having respectively for their guardians William Nice, Jr., and the Fidelity etc. company.

The estate held 56 shares of the Fifth and Sixth streets passenger railway stock, to which 18 shares were added under these circumstances: The capital stock of the railway corporation consisted of 15,000 shares. On December 14, 1888, the stockholders sanctioned in due form an additional issue of 5,000 shares, and provided that each stockholder should have the privilege of buying at $50 one share of the new issue for every three shares of his original holding.

The notice for the stockholders' meeting to approve or disapprove of the issue, was sent out in the lifetime of Alonzo Smith; and, pursuant to the resolutions adopted at that meet-

ing, the stock certificates were dated January 2, 1889, on which day the privilege of subscribing began. The option expired February 2, 1889. The trustees exercised the option to subscribe for the new issue, and, in virtue of the 56 shares held by them, bought 18 new shares, paying therefor $900. This sum was paid out of accumulated income moneys, all the capital of the estate being then invested and not available for that purpose; the income account being afterward made good for the amount.

On February 18, 1889, the company declared a dividend of $11 per share upon its entire capital stock, including the new issue. After payment of the customary dividend for 1888, no more profits remained to be divided, and the effect of the dividend in February, 1889, was simply to return to the purchasing stockholders what they paid for the new stock. Indeed, that was its avowed purpose. The notice which was given to the stockholders of the declaration of this dividend, read as follows:

"PHILADELPHIA, February 5, 1889.

"The board of directors have this day declared a dividend of eleven dollars per share on the entire stock of the company, 20,000 shares.

| | |
|---|---|
| Subscription to 5,000 shares at $50 . . | $250,000 |
| Less the state and city tax, about . . . | 30,000 |
| | $220,000 |
| Dividend $11, on 20,000 shares . . . | $220,000 |

THOS. S. HARRIS,
Secretary.

"By order of the board of directors."

The new issue did not affect the selling price of the company's stock. In September, 1888, before the movement was projected or was even in contemplation, the stock sold for $267; and in February, 1889, after the subscription books had closed, it sold for $260 and $265. The company paid large dividends, which varied little in amount from year to year. Its capital, including its surplus in the sinking fund, showed as little variation.

| | |
|---|---|
| In January, 1885, its total assets were . | $1,118,147.59 |
| In January, 1889, they were . . | . 1,126,344.33 |
| In 1884, the sinking fund (established to retire a mortgage of $100,000) amounted to | 12,000.00 |

In 1889 it had increased to    .    .    .    $38,000.00

The cost of construction and equipment was
    represented to be about   .    .    .    .   1,020,000.00

The original capital stock cost   .   $750,000

The new stock cost    .    .    .   250,000
                         ————  1,000,000.00

There had been earnings in prior years to the amount of $250,000, which were placed in betterments, and the new stock was intended to represent these betterments. The effect of the transaction was to enable the owners of the original shares to realize upon their holdings what their shares were actually worth. It went upon the theory that the shareholders owned all the property of the corporation, but that their stock did not properly set forth that ownership. By the new issue the whole capital was made marketably available.

Upon the facts so found, the auditing judge concluded, as matter of law, that both the dividend of $814 received by the trustees in February 1889, and the sum of $3,870 received from the sale of the eighteen shares of new stock, should be accounted for as part of the principal of the trust estate, and he adjudged that the accountants had in their hands, for distribution, principal to the amount of $62,636.45.

Exceptions to the adjudication were dismissed by the court in the following opinion, PENROSE, J.:

Had it been shown by the exceptants that profits earned during the lifetime of the cestui que trust were used by the corporation for the purpose of improving its equipment and adding to the value of its assets, and that the issue of new stock for an equivalent amount was merely a method of liberating the profits thus retained in order to permit their distribution among the stockholders, the case would have been governed by Earp's App., 28 Pa. 368, the doctrine of which has, under the designation of the Pennsylvania rule, been accepted by every state in the Union, except Massachusetts and Georgia: Cook on Stocks and Stockholders, § 554, and the new stock would have belonged to the tenant for life. Or, perhaps, if the cash paid by subscribers had remained in the treasury of the company, and in this way gone to increase the capital, he might, under Wiltbank's App., 64 Pa. 256, have been so entitled.

But this was not shown, nor could it have been. On the contrary, it appeared affirmatively that the value of the assets, at the time of the new issue, was almost identical with the value at the time of the testator's death, and hence, that the capitalization of profits must have taken place, if at all, prior to that event; while the moneys received by way of subscription, labeled "extra dividend," were at once returned to the persons making payment. The testator's death, of course, so far as his estate was concerned, fixed as principal everything earned in his lifetime : Nice's App., 54 Pa. 202.

Before the issue of the new stock, the assets of the company, after payment of liabilities, were divisible among the holders of fifteen thousand shares of stock ; after the issue, the same assets became divisible among the holders of twenty thousand shares. The effect of the transaction, therefore, was simply to change the shares by an increase of number, with a corresponding lessening of intrinsic value.

It is of no importance, if it be the fact, that the market price of the stock was not affected by the new issue. As between tenant for life and remainder-man, as was said in Moss's App., 83 Pa. 271, the question of value is to be determined, not by the fluctuations of the stock market, but by the actual assets held by the corporation making the stock dividend. The case is directly within the ruling of Moss's Appeal and Biddle's App., 99 Pa. 278, while it is more readily distinguishable from Wiltbank's Appeal than either of them.

It is quite clear, also, that the estate of the tenant for life is not entitled to any part of the so-called extra dividend. Apart from the fact that it was not declared until after his death : McKeen's App., 42 Pa. 479, the dividend was in no sense a dividend of profits earned, in whole or in part, in the lifetime of the tenant for life ; and, therefore, the doctrine of Earp's Appeal, even if it ever has any operation between tenant for life and remainder-men, as to profits accruing after the death of a testator, is inapplicable. The extra dividend was nothing else than a return to the stockholders of the money paid in carrying out the scheme for increasing the number of shares of stock, and we must decide upon facts without regard to the names which may have been applied in distributing the fund. Non quod dictum est, sed quod factum est inspicitur.

Arguments.

Of course, if the accountants used accumulated income in paying the subscription for the new stock, the principal became debtor to that extent to the tenant for life, and he, or his executor, is entitled to re-payment.

The exceptions are dismissed, and the adjudication confirmed absolutely.

—Thereupon Alfred Percival Smith, administrator of the estate of Alonzo Smith, deceased, took this appeal.*

*Mr. George Tucker Bispham*, for the appellant:

The resolution authorizing the issue of the new stock, and the commencement of the option to subscribe for it, were prior to the death of the life-tenant, and the right to take it accrued during his life.

1. It is attempted to determine the question whether the resulting benefits are capital or income, by the test whether the earnings represented by the increase of stock were made before or subsequent to the vesting of the estate in the life-tenant, and Earp's App., 28 Pa. 368, is relied on as authority for this. The rule laid down in that case was attempted to be carried out in the early English cases, but it was subsequently abandoned, it being found impossible to determine, upon any reasonable rule, what portion of profits accrued prior to a fixed time, and what portion subsequent thereto, when the distribution is not made for a considerable period afterwards: Paris v. Paris, 10 Ves. 189; Barclay v. Wainewright, 14 Ves. Jr. 66; Witts v. Steere, 13 Ves. 369. In Earp's Appeal, this difficulty was apparent to the court, and an attempt was made to evade it, by holding that, for the sake of convenience, the alleged rule was in a number of cases not strictly applied. The rule adopted in England, and in many states of this country, is that the ownership of profits distributed, as between a life-tenant and a remainder-man, is in the person who is entitled to dividends at the time the distribution is made: Taylor on Corp., §§ 799, 800. The principle of it is, that a shareholder has no absolute right to the profits before a dividend thereof is actually declared: Taylor on Corp., §§ 562, 570.

2. Therefore, even if the profits for which this stock was is-

---

* The assignments of error filed were not printed in the paper-books.

Arguments.

sued were earned prior to the estate of the life-tenant, yet, being expended with the consent of the stockholders for betterments, they did not vest as earnings, and there was no absolute right to them until declaration of a dividend thereof, and the amount of such dividend, by the analogy of an assignor and assignee of stock, would in this case belong to the life-tenant: Miller v. Guerrard, 21 Am. L. Reg. N. S. 381 (Sup. Ct. of Georgia); Richardson v. Richardson, 75 Me. 570 (46 Am. Rep. 428; 6 Am. & Eng. Corp. Cas. 569). The mere form of the distribution will not affect the rights of those entitled to the money distributed: Moss's App., 83 Pa. 264; Matson's Ford Br. Co. v. Commonwealth, 117 Pa. 265. The only sound test is whether in the hands of one who is a stockholder in his own right, such an option to purchase stock should be credited to an increase of his capital, or to the product of the capital already invested: Wiltbank's App., 64 Pa. 256, which practically rules this case. The transaction in question must be carefully distinguished from a mere watering of stock, or a substitution of an entire new issue of stock for that already existing; and this distinction differentiates the present case from Moss's App., 83 Pa. 264; Biddle's App., 99 Pa. 278, and Vinton's App., 99 Pa. 434.

*Mr. John Marshall Gest*, for the Fidelity etc. Co., guardian of Mary E. Smith, and *Mr. Edwin Saunders Dixon*, for Wm. Nice, Jr., guardian of Lane M. Smith, appellees:

Wiltbank's App., 64 Pa. 256, relied on by the appellant, differs materially in its facts from the case at bar, and stands " upon its own peculiar facts : " Moss's App., 83 Pa. 264. Matson's Ford Br. Co. v. Commonwealth, 117 Pa. 265, arose under the revenue laws taxing dividends declared, and has no bearing on the present question. The rule laid down in Earp's App., 28 Pa. 368, that profits accumulated prior to the testator's death must be regarded as capital, has been followed and applied in a long line of cases: McKeen's App., 42 Pa. 479; Moss's App., 83 Pa. 264; Biddle's App., 99 Pa. 278; Vinton's App., 99 Pa. 434; Turpin's Est., 21 W. N. 542; Phila. Trust Co's App., 24 W. N. 137; s. c. 1 Mona. 230; Thomson's Est., 11 W. N. 482; Oliver's Est., 136 Pa. 43. See, also, leading article in 5 Am. L. Rev. 720 ; note to Miller v. Guerrard, 21

Am. L. Reg., N. S., 381; Atkins v. Albree, 12 Allen 359; Barton's Trusts, L. R. 5 Eq. 238.

OPINION, MR. JUSTICE CLARK:

The question in this case arises upon the adjudication of the account of Alfred and Horace T. Smith, trustees under the will of Stephen Smith, deceased, who died in October, 1884. By his will the testator gave a portion of his estate in trust to pay the net income to his son Alonzo Smith, free from his debts, for life, with remainder over to his children, etc. Included in this part of his estate were fifty-six shares of the capital stock of the Frankford & Southwark Passenger Railway Company. The whole capital stock of the company was $750,000; that is to say, 15,000 shares, of the par value of $50 per share. On the 4th December, 1888, however, it was agreed at a meeting of the stockholders to issue 5,000 additional shares, at the par value of $50 per share, the existing stockholders, as they were registered 2d January, 1889, to have the right, at any time before 2d February thereafter, to subscribe one share for every three of their respective holdings on the day designated.

The trustees of Stephen Smith's estate exercised the privilege, and bought eighteen shares, for $900, which, for the time, they borrowed from the income fund in their hands, but in their account they have made good the income, and have treated this sum as so much taken from the capital. On the 18th February, 1889, the directors declared a dividend of $11 per share on the whole 20,000 shares. This dividend was made exactly to cover the price of the extra shares, less the state and city taxes as follows:

| | | | |
|---|---|---|---|
| Subscription to 5,000 shares, at $50 | . | . | $250,000 |
| Less state and city taxes, about | . | . | 30,000 |
| | | | $220,000 |
| Dividend 20,000 shares, at $11 | . | . | $220,000 |

In the meantime, on the 12th January, 1889, Alonzo Smith, the life-tenant, died, leaving to survive him two children, Laura M. and Mary E. Smith, both of whom were minors. The appellant, Alfred Percival Smith, is the administrator of his estate, and the appellees are the guardians of his children. The dividend on the seventy-four shares yielded to the estate $814; it

*Opinion of the Court.*

was declared after the decease of Alonzo Smith, and was applied to those entitled in remainder. Upon a sale of the eighteen shares, the profit realized was $3,870, and the trustees accounted for this as capital. To this method of accounting the administrator of Alonzo Smith's estate excepted, claiming that this sum must be treated as income, and as such that it constituted part of the assets of that estate. The auditing judge, as well as the Orphans' Court, held the $3,870 to be capital, and not income, and this is the error assigned.

The appellant's contention is that accumulated profits, when distributed as dividends, belong to the holder of the stock at the time of the distribution, although they may have been earned during a prior ownership; a shareholder having no absolute right to such profits before a declaration of a dividend thereof. But it is well settled in this state that, when the stock of a corporation is by the will of a decedent given in trust, the income thereof for the use of a beneficiary for life, with remainder over, the surplus profits, which have accumulated in the lifetime of the testator but which are not divided until after his death, belong to the corpus of his estate; whilst the dividends of earnings made after his death are income, and are payable to the life-tenant, no matter whether the dividend be in cash, or scrip, or stock.

The leading case in Pennsylvania is Earp's App., 28 Pa. 368. The residuary estate of Robert Earp, who died in November, 1848, embraced stock in a manufacturing company upon which large surplus profits, over and above the current dividends, had accumulated both before and after his decease. In July, 1854, the capital stock was increased from $200,000 to $500,000, by creating 6,000 additional shares, of $50 each, which were paid for out of the accumulations. At the testator's death, these surplus profits were near $300,000; when the stock issued, they had increased to $700,000. The market value of the stock at his death was $125 per share; when the new stock issued its value was $80, but the number of shares belonging to the estate was 1,350 instead of 540. As the new shares were therefore in part paid from the surplus existing at the death of Robert Earp, and partly from the accumulations after his death, they were properly apportioned between the life-tenant and those entitled in remainder. It was held (*a*) that the surplus profits

accumulated at the death of the testator, as respects the estate were essentially part of the stock itself, and were subject to the trusts in the will as so much principal; and (*b*) that the accumulations after his decease, when they come to be divided, are income in like manner as the current dividends, and therefore belong to the life-tenant, no matter whether the division or distribution thereof be in cash, or scrip, or stock. "In the case before us," said the Chief Justice, "the testator has not made a bequest of the stock itself to the appellants; on the contrary, he has given them only the income of it for life. Their interests commence after the death of the testator. They have no right whatever to claim the income which had accumulated before his death. . . . . It is equally clear that the profits arising since the death of the testator are income, within the meaning of the will, and should be distributed among the appellants."

Moss's App., 83 Pa. 264, distinctly recognizes the doctrine and authority of Earp's Appeal, but, as the facts were different, a somewhat different result ensued. Earp's Appeal differs from Moss's Appeal, in this: In the former, the new issue of stock was paid for entirely from the surplus profits. There was an actual distribution of profits, as profits, in the form of stock,—profits which had accumulated both before and after the testator's death; whilst in Moss's Appeal there was merely a right to subscribe and pay for new shares at their par value, and it did not appear what, if any, portion of the existing surplus was accumulated after the death of Henry Lazarus, or that the value of the stock had advanced after that time until the new stock was issued. No profits were declared or distributed; the stock was purchased at a price, the object being, not to divide profits as such, but to increase the capital. The right to subscribe for shares was, we think, an interest attaching to the stock, and neither the amount received from the sale of that right, nor the stock purchased with the proceeds, can, under the facts of that case, be considered as a product or profit for the life-tenant. The par value of the stock, as we have said, was $100, but it had a market value of $240: it turned out, however, that the new issue of shares depreciated the shares to $170. It required the addition of the forty new shares to the old to maintain the integrity of the investment. One hundred shares, at $240, were worth $24,000, whilst one

hundred and forty shares, at $170, were worth only $23,800; so that in fact there was no profit. Our Brother PAXSON, in the opinion, says: " It requires but a cursory examination of this transaction to show that no profit has been made, except upon paper. As before observed, the corporation had declared no profits, and distributed none. It merely allowed the holder of each share of the old stock to subscribe for a corresponding share of new stock, and to pay the company the par value thereof. . . . . If the company had gone into liquidation the day before the issue of the new stock, the one hundred shares of original stock would have realized $24,000; if it had gone into liquidation the day after, the one hundred and forty shares would have realized nearly the same sum. Where, then, was the profit?"

Biddle's App., 99 Pa. 278, is in line with Moss's Appeal. There was no division of surplus profits, or of earnings accumulated either before or after the death of the testatrix, Mary Condy, deceased; the transaction was simply an increase of stock to the stockholders, upon payment of the price at par, and ten dollars per share additional to go to the surplus fund. The market value of the old stock was not shown to have varied between the testatrix's death, on the 29th June, 1880, and the issuing of the new stock, on the 15th November, 1880, and but a very slight diminution took place after the issue; there was, however, a loss in the intrinsic value to the amount of seventy-five cents per share. Instead of subscribing for the new stock, the executor sold the privilege, and the question was whether the sum realized should be treated as income or principal. In the opinion filed, this court said : " The entire value of the stock, with all its incidents, at the death of the testatrix constituted the principal of the estate. On this principle the appellant was entitled to the income. Whatever value beyond par the stock then had, by reason of the large surplus fund of the company, or otherwise, attached to the stock and formed a part of the principal. The appellant was not given any part of this aggregate value of the stock ; the income therefrom was all she was entitled to receive. Whatever was capital must remain capital. . . . . It is not shown that the stock was of greater value on the 15th November than on the day of the death of the testatrix, nor that the surplus fund

had been increased in the meantime. . . . . The distinction between the surplus fund, existing at the time of the death of the testator, and a fund accumulated afterwards, is distinctly recognized in Earp's App., 4 Cas. 368. That which had accumulated before the death of the testator was held to be part of the principal of the fund, and that which accumulated after his death to be income."

The same rule is recognized, with special reference to Earp's Appeal as authority, in McKeen's App., 42 Pa. 479; in Vinton's App., 99 Pa. 434; and in Philadelphia Trust Co.'s App., 24 W. N. 137; s. c. 1 Mona. 230. The last case bearing upon this question is the very recent one of Oliver's Est., 136 Pa. 43. The contest there, as here, was between the life-tenant and the remainder-man, and the question whether the fund in the hands of the trustees was income or principal was settled in harmony with Earp's Appeal, which is referred to as establishing the rule in this state.

Wiltbank's App., 64 Pa. 256, in no way collides with the ruling in Earp's Appeal. It may perhaps be to some extent inconsistent with Moss's Appeal or Biddle's Appeal, but it is in full accord with the well-settled rule that the life-tenant is entitled to the income accruing after the death of the testator, and that surplus profits accruing in his lifetime, when they come to be distributed, are principal, and not income. As the court said in Moss's Appeal, that case must stand upon its own peculiar facts. It may be distinguished, if at all, from the cases mentioned, in this, that in the increase of the stock there was no impairment of either the actual or the market value of the shares.

From this hasty review of the cases, it will be seen that the ruling in Earp's Appeal has, for more than the third of a century, been steadily maintained, without modification or change; in no subsequent case, we believe, has its authority been doubted, its practicability questioned, or the soundness of its doctrine impeached. It has not only been adhered to in this state, but it has been adopted and followed in nearly all of the states. It is referred to in the text-books as the Pennsylvania rule; but, as remarked by Mr. Cook in his very recent treatise on Stocks and Stockholders, etc., § 554: "Inasmuch as it obtains in every state of the Union, excepting Georgia and Massachu-

setts, it might well be called the American rule." The rule which prevails in Massachusetts and Georgia is to regard cash dividends, however large, as income, and stock dividends, however made, as capital: Minot v. Paine, 99 Mass. 101, whilst the English rule is that the intention of the corporation to declare a dividend, as such, is to govern, and therefore the ordinary or current dividends are regarded as income, and extraordinary dividends as belonging to the corpus : it matters nothing, in either case, whether the dividend be of cash, or stock, or property : See Cook on Stocks, etc., § 556, and cases there cited. It must be conceded, we think, that whilst the Pennsylvania rule may in some cases, perhaps, be more difficult in its application, when properly applied it arrives at results which are absolutely just, and secures to the life-tenant, and to those entitled in remainder, precisely what they of right are entitled to have, and this cannot be said of the practical operation of any other rule.

The appellant asks us to depart from this well-settled and salutary rule. His contention is that, as a shareholder has no absolute right to profits until a dividend thereof is declared, the ownership of profits, as between a life-tenant and a remainderman, is in the person who is entitled to dividends at the time of the distribution, although they may have been earned during a prior ownership. "Therefore, in this case," he says, " even if the profits for which this stock is issued were earned prior to the estate of the life-tenant, yet, being expended with the consent of the stockholders for betterments, they did not vest as earnings, and there was no absolute right to them until the amount had been declared as a dividend : and such amount, by the analogy of an assignor and assignee of stock, would in this case belong to the life-tenant." To adopt such a conclusion would be to overrule the whole line of Pennsylvania cases, to which we have referred, and to adopt a method of distribution which wholly ignores the rights of the parties, and defeats the just and clear purpose of the testator ; for it is perfectly plain that the value of the stock at the testator's death was composed in part of these accumulated profits. If the trustees, in order to change the investment, had at the testator's decease sold the shares, they would have received their value as affected by the surplus then undivided, and the

amount received would, in that case, have been the principal upon which the life-tenant would be entitled to receive income. Upon what principle of justice, then, should the act of the corporation, over which the parties had no control, be allowed to affect their rights, by taking from the remainder-men that which clearly belongs to them, and handing it over bodily to the life-tenant?

The original capital of the company was $750,000: the new stock increased this to $1,000,000. The cost of construction and equipment of the road represented about $1,020,000. The testator died in October, 1884: on the 1st January following, the assets were $1,118,147.59; and on the 1st January, 1889, which was the day before the stock issued, the assets were $1,126,344.53. It is certain, then, that the profits of the business were, to the amount of the new stock, applied to betterments, and were actually thus capitalized in the testator's lifetime. Under the Pennsylvania rule, therefore, when they come to be distributed, they should go to principal, and not to income.

As remarked by the auditing judge: " The whole effect of the transaction in dispute was to enable the owners of the original shares, among whom are the parties in remainder, to realize upon their holdings what the shares were actually worth. It went upon the theory that the shareholders owned all the property of the corporation, but their stock did not properly set forth that ownership, and to the extent that it failed to represent the full value of such ownership it was unavailable. By the new issue the whole capital was made marketably available. It worked no injustice to the life-tenant; he got a dividend on new shares as on the old, and he was better off than before."

It is true the market value of the shares was not greatly, if any, impaired by the increase, but the question of value is to be determined, not by the fluctuations of the stock market, but by the actual assets held by the corporation: Moss's Appeal, supra; Biddle's Appeal, supra. It is the intrinsic value of the shares, to be ascertained from the amount and value of the assets at the death of the testator, and at the time of the increase of the stock, which governs in the apportionment of the surplus profits. The market value may aid in the ascertainment of the actual value, and is therefore properly received in evidence on

that issue: Earp's Appeal, supra; Moss's Appeal, supra. In the latter case, however, it was said that the market value rep resented the actual cash assets in the hands of the company. We are of opinion that this case was correctly decided, and

The decree of the Orphans' Court is affirmed, and the appeal dismissed at the cost of the appellant.

April 13, 1891, motion for a re-argument refused.