King Estate.

Argued May 28, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Emanuel S. Leopold* and *Ella Graubart*, with them *Scheeline & Leopold* and *Patterson, Crawford, Arensberg & Dunn*, for appellant.

*Howard Zacharias*, for appellee.

*Ernest Scott*, with him *Pepper, Bodine & Stokes*, for Ethel D. L. Sawin and Edward R. Laughlin, interested parties, under Rule 61.

*Thomas N. Griggs*, with him *Wm. D. Evans* and *Griggs, Moreland, Blair & Douglas*, for Trustee.

Opinion by Mr. Justice Horace Stern, April 19, 1949:

This is the third,[1] hopefully the last, stage in the adjudication of the rights of the parties in this controversy.

Willis L. King died in 1936 having created in his will a trust for his widowed daughter-in-law for life with remainder to her three sons. Among the original assets of the trust estate were 778 shares of 7% cumulative preferred stock, and 783 shares of common stock, of the Jones & Laughlin Steel Corporation. In 1937 the trustee sold 300 of the latter shares leaving 483 shares of common in the trust. At the time of testator's death unpaid dividends on the preferred shares had accrued to the extent of $26.25 per share; by the year 1941 this arrearage had increased to $46.25 per share. While the Jones & Laughlin Corporation had a book surplus far in excess of the amount that would have been required to pay those dividends its assets apparently were not sufficiently liquid for that purpose, and, as no dividend could be declared on the common stock until the arrears on the preferred stock had been paid, the corporation resorted—as others have done under similar circumstances [2]—to a method by which the potential rights of the preferred stockholders could be satisfied and the way cleared for the declaration of dividends on the common stock. The device thus adopted was that of a merger between the Jones & Laughlin Corporation and two of its wholly owned subsidiaries, with a resulting recapitalization. There was issued new 5% cumulative preferred stock in exchange for the old preferred on a share for share basis, and there was given in exchange for each share of the old common of the par

---

[1] *King Estate*, 349 Pa. 27, 36 A. 2d 504; *King Estate*, 355 Pa. 64, 48 A. 2d 858.

[2] For example, the Pittsburgh Crucible Steel Company, as to which see *Fisher's Estate*, 344 Pa. 607, 26 A. 2d 192.

value of $100 one share of new common of no par
value. Those exchanges do not enter into or affect the
problem with which we are here concerned, but the
recapitalization further involved a distribution of 1¼
shares of the new common stock for each share of the
old preferred. As a result the King Estate, in addition
to 778 shares of new preferred and 483 shares of new
common in exchange for its old holdings, received 972½
shares of new common stock (778 × 1¼), which, three
years later, the trustee sold[3] in the market for $20,-
809.93 and it is the proper apportionment of those pro-
ceeds between the life tenant and the remaindermen
which is the problem presently presented. Such appor-
tionment was ordered by the decree of this Court entered
October 1, 1946 (*King Estate,* 355 Pa. 64, 70, 48 A. 2d
858, 862), the record being then remitted to the court
below for that purpose. In pursuance of that decree an
order was made by Judge BOYLE of the Orphans' Court
of Allegheny County awarding to the life tenant the
sum of $19,611.01 and to the trustee, to be held for the
remaindermen, the sum of $1,198.92. Exceptions having
been filed to that order, it was reversed by the court en
banc in an opinion by Judge COX, President Judge
TRIMBLE concurring and Judge BOYLE dissenting, and
the entire sum of $20,809.93 was awarded to the trustee
to be held for the remainderman,—none of it to the life
tenant. The life tenant now appeals from that decision.

While it cannot be said, of course, that the additional
common stock distributed by the Jones & Laughlin Cor-
poration in this instance constituted a stock dividend
in the ordinary sense of that term, it *was* issued in order
to compensate the preferred stockholders for the effec-
tive cancellation of their right to receive the accumu-

---

[3] More accurately, the trustee sold the ½ share immediately,
and it was the remaining 972 shares which three years later realized
the sum of $20,809.93.

lated unpaid dividends on their stock, and the reasons which call for an apportionment in the case of an actual stock dividend apply equally to a situation such as that here presented, for here too a trust estate has become the recipient of a large number of additional shares of stock and the same problem must therefore be met as to who, life tenant or remaindermen, is entitled to that accretion. Since this stock was given, if not in express payment of accumulated arrears of dividends, at least in lieu of, or compensation for, the surrender of the right to receive such dividends, it would naturally result that the life tenant is entitled to the stock thus acquired and therefore to the proceeds of its sale,—a right subordinated, however, as in every case where the doctrine of apportionment applies, to the necessity of maintaining the intact value of the stock held by the Estate in the Jones & Laughlin Corporation as it existed at the time of testator's death. The problem therefore resolves itself into the simple question: [4] What proportion of the 972 additional shares received by the trust estate would it have been necessary to set aside to corpus in order to preserve the intact value of the stock of the Jones & Laughlin Corporation held by the Estate? Of course the merger did not in any way impair the intact value of the preferred stock, which remained in the amount of $100 per share, but, due to the fact that the assets of the corporation were now represented by a greater number of shares of common stock, there obviously resulted an impairment of the intact value of the 483 shares of common stock held by the Estate, and that impairment must be taken into account since all the stock owned by the Estate in the Jones & Laughlin Corporation must be regarded for this purpose as a single, integrated investment. At the time of testator's death the intact value

---

. [4] The merger having antedated the enactment of the Uniform Principal and Income Act of May 3, 1945, P. L. 416, the provisions of that statute do not apply here.

of the common stock was admittedly $158.80 a share, making a total value of the 483 shares of $76,700.40. The award of 1¼ shares of common stock for each share of preferred amounted to a total issue by the corporation of 733,920 new shares, which, added to the original number of shares of common stock of the corporation of 576,320, made a new total of common stock outstanding of 1,310,240 shares. The book value of the assets of the corporation at the time of the merger, after deducting the par value of the outstanding preferred stock, amounted to $116,176,053, and the division of that amount by the 1,310,240 shares shows that the book value of each share of common stock after the merger was $88.67. What then was the situation of the Estate as the result of the merger? Instead of holding 483 shares of common stock the intact or book value of which was $76,700.40, it now held 1455 shares (483 + 972) of a book value of $88.67 per share or a total of $129,014.85. Thus, by the merger, the Estate, due to the fact that it held a large block of preferred stock and, at that time, a much smaller holding of common stock, profited in the total value of its stock in the Jones & Laughlin Corporation to the extent of $52,314.45. It is therefore obvious that, at $88.67 per share, the Estate would have had to own, in order to preserve the intact value of its common stock, only 865 shares of the new common ($76,700.40 ÷ $88.67), and consequently had to retain for corpus, out of the 972 new shares it received, only 382 shares in addition to the 483 shares already held by it (382 + 483 = 865); by the same token, the remaining 590 of the new shares represented the portion of the stock received which was not required to maintain intact value and was therefore clearly allocable to the life tenant. The result is that the fund of $20,809.93 received from the sale of the 972 shares must be apportioned on that basis, namely, 382/972 or $8,178.03 to corpus and 590/972 or $12,631.90 to the life tenant. Such a method of appor-

tionment is prescribed in all of our adjudicated cases; for example: *Earp's Appeal,* 28 Pa. 368; *Flaccus's Estate,* 283 Pa. 185, 129 A. 74; *Mallory's Estate,* 285 Pa. 186, 131 A. 714; *Dickinson's Estate,* 285 Pa. 449, 132 A. 352; *Flinn's Estate,* 320 Pa. 15, 25, 181 A. 492, 496, 497; *Daily's Estate,* 323 Pa. 42, 48, 186 A. 754, 757; *Barnes' Estate,* 338 Pa. 555, 12 A. 2d 912. Such cases as *Nirdlinger's Estate,* 290 Pa. 457, 139 A. 200; and *Waterhouse's Estate,* 308 Pa. 422, 162 A. 295, have here no relevancy whatever, since they did not deal with a receipt by the trust estate of any additional stock, but merely with a sale by the trustee of stock already held by it, and the question of apportionment was therefore concerned only with the excess obtained in such sale over the original intact value depending upon whether or not such excess was due to an accumulated surplus from the earnings of the corporation.

The adjudication by Judge BOYLE erred in this—that it was based only on a consideration of the impairment of the intact value of the common stock as between the time of the testator's death and the time immediately prior to, instead of immediately after, the merger, thus wholly ignoring the real question as to the impairment resulting from the merger itself. On the other hand, the decision of the court en banc erred because it was based on the mistaken conception that the intact value of the stock had to be maintained, not by the book value of the additional stock awarded to the Estate, but by the sale price of the stock when sold by the trustee three years after the merger. The necessity of preserving intact value does not mean a preservation in the sense of the estate's actually obtaining the amount of that intact value in cash, but only a preservation of its book value; intact value and market value are, for this purpose, wholly unrelated; many stocks sell on the market for less than one-tenth of their book values, while other

stocks, especially if speculative in nature, sell for many times their book values; the value of a stock in the market depends upon a myriad of factors other than the actual inventory value of the company's assets as reflected in the books of the corporation. Thus, while the intact value of the Jones & Laughlin common stock at the time of testator's death was $158.80 a share, the stock had nothing like that value in cash on the market, and that a like discrepancy between market value and book value existed when the stock was sold is obvious from the fact that the price realized of $21.67 per share was far less than the book value at that time.

In *Moss's Appeal*, 83 Pa. 264, this Court said (pp. 270, 271): "The fallacy of this theory consists in the fact of estimating the one hundred and forty shares, not at their actual value at the time of the transaction, but at their market value, three years afterwards. A more uncertain rule could not well be imagined. It would make the rights of the parties depend upon the condition of the stock market, which is as variable as the tides, without their regularity. Market values are well enough upon a question of distribution, where the parties are about to realize; but upon a question of values between life tenants and remaindermen, a judicial decree should go down through the shifting sands of the stock market until it reaches the solid rock of actual values. The application of any other rule might work serious injustice. It is well known that within the last year the stock of more than one large corporation has varied in price over one hundred per cent. Even if the market value were a proper test, why take it three years after the transaction occurred? Why not one year, two years, or any other time? The tenant for life and remaindermen might well differ as to the precise day which should fix the market value, as the bulls or the bears might happen to be in the ascendant. . . . In such a case as this, the

solemn judgment of a court upon a question of values, defining the rights of parties in the future, must have a more secure foundation. The date at which the value of this stock must be estimated is the time when the transaction took place. Its actual value then was $170 per share. This valuation is based, not upon the caprice of the market, but upon actual assets in the hands of the company."

In *Smith's Estate,* 140 Pa. 344, 21 A. 438, Judge PENROSE in the Orphans' Court of Philadelphia said (p. 348) : "Before the issue of the new stock, the assets of the company, after payment of liabilities, were divisible among the holders of fifteen thousand shares of stock; after the issue, the same assets became divisible among the holders of twenty thousand shares. The effect of the transaction, therefore, was simply to change the shares by an increase of number, with a corresponding lessening of intrinsic value. It is of no importance, if it be the fact, that the market price of the stock was not affected by the new issue. As between tenant for life and remainderman, as was said in Moss's App., 83 Pa. 271, the question of value is to be determined, not by the fluctuations of the stock market, but by the actual assets held by the corporation making the stock dividend." Our own Court, in affirming Judge PENROSE'S decision, said (p. 357, A. p. 440) : "It is true the market value of the shares was not greatly, if any, impaired by the increase [in the number of shares], but the question of value is to be determined, not by fluctuations of the stock market, but by the actual assets held by the corporation: Moss's Appeal, supra; Biddle's Appeal, supra. It is the intrinsic value of the shares, to be ascertained from the amount and value of the assets at the death of the testator, and at the time of the increase of the stock, which governs in the apportionment of the surplus profits."

To the same effect is *Stokes' Estate, No. 1*, 240 Pa. 277, 285, 87 A. 971, 974, and *Stokes' Estate, No. 2*, 240 Pa. 288, 87 A. 975. See also 33 Am. Jur. 917, §393, footnote 17, and 33 Am. Jur. 920, §395.

The decree of the court below is reversed, and the record is remitted with direction to award $8,178.03 of the fund for distribution to the trustee to be held for the remaindermen, and $12,631.90 to the life tenant; costs to be paid out of the estate.

---

CONCURRING OPINION BY MR. JUSTICE JONES:

When this matter was last here before,[1] three members of the Court dissented on the grounds (1) that the rule of apportionment applicable to extraordinary *corporate* distributions of surplus earnings, a portion whereof accumulated prior to the death of the settlor of an interested trust, has no proper place in the disposition of additional shares received by a trust estate under circumstances such as this case presents, (2) that the additional common shares received by the King estate upon the trustee's voluntary exchange of old corpus preferred stock for new preferred on a share for share basis (each of $100 par) were paid and accepted in discharge and extinguishment of the stockholder's right to the accumulated and unpaid dividends on the old preferred and (3) that the proceeds realized by the trustee from its sale of the additional shares represented income and, as such, were distributable in their entirety to the life tenant.[2]

---

[1] *King Estate*, 355 Pa. 64, 70, 48 A. 2d 858.

[2] *Fisher's Estate*, 344 Pa. 607, 26 A. 2d 192. The one factual difference to be noted between *Fisher's Estate* and the instant case is that, in the former, the shares owned by the trust estate were exclusively preferred stock, while in *King Estate* the trust owned both preferred and common shares of the particular corporate issues. The difference, however, is without legal significance: see *Re Smith's*

Without retracting or in any way departing from our former dissentient views, I concur in the action taken by the majority on the instant appeal as constituting an accurate application of the rule heretofore laid down by this court in this estate which, thereupon, became "the law of the case".

Mr. Justice DREW and Mr. Justice PATTERSON join in this concurrence.

DISSENTING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

As it is conceded that our two prior decisions in this estate established the *law of the case* (i.e., that this transaction was an exchange and not payment of deferred dividends), the single question for decision is whether the intact value required to be preserved is that fixed as of the *date of the inception of the trust* or that *determined as of the date of the merger*. The majority accept the latter date, whereas under all our prior cases the former date has been consistently applied.

This Court defined intact value in *Waterhouse's Estate,* 308 Pa. 422, 162 A. 295, p. 427: "The value of a trust estate, where its income is paid to life tenants with remainder over, *is determined as of the time the testator dies* (emphasis supplied) and is called intact value. It is so named because that *value is to be kept intact for remaindermen* in the various subsequent distributions of income that might impair it. It was early stated that intact value includes par value of stock when par

---

*Will Trust; Smith v. Melville,* 155 Law Times Reports 249, Chancery Division (1936), which involved a merger and exchange of stocks under circumstances precisely similar to the *King Estate* and the trust owned *both* preference and ordinary shares. Compare *Re MacIver's Settlement; MacIver v. Rae,* 154 Law Times Reports 339, Chancery Division (1935), a consonant earlier decision by the same English court on the same merger and exchange but where, as in *Fisher's Estate,* supra, the trust owned *only* preference shares.

has been paid, plus any accumulations at the date of death, but, prima facie, intact value is book value. Intact value may be increased by stock purchases, contributed surplus or any other capital increase not attributable to earnings, and it is subject to capital losses. The burden of lowering or raising an intact value thus established lies on the party asserting it."

In the footnotes the following cases are cited in support of this principle: *Earp's Appeal,* 28 Pa. 368; *Baird's Estate,* 299 Pa. 39, 42, 148 A. 907; *Dickinson's Estate,* 285 Pa. 449, 453, 132 A. 352; *Packer's Estate (No. 1),* 291 Pa. 194, 197, 139 A. 867; *Jones v. Integrity Trust Co.,* 292 Pa. 149, 140 A. 862. See also report *to the same effect,* by Mr. Justice Jones (when a practicing attorney acting as guardian and trustee ad litem) in *Flinn's Estate,* 320 Pa. 15, 181 A. 492, p. 17, adopted in the court below, and per curiam in this Court. A careful examination of the cases concerning the definition and method of ascertaining intact value makes it crystal clear that there can be but *one* intact value, viz.: *the one existing at the date of death.*

The word value, as used in the expression *"intact value"* is measured *in terms of money*: *Jones v. Integrity Trust Co.,* 292 Pa. 149, 152, 140 A. 862; *Flinn's Estate,* 320 Pa. 15, 25, 181 A. 492; *Neafie's Estate,* 325 Pa. 561, 563, 191 A. 56.

At *death, December 11, 1936,* decedent possessed 778 shares of preferred stock, par $100, which was its *intact* value; he also owned 783 shares of common stock, par $100, with an *intact value* of $158.80 (see findings of fact, Judge Mitchell in 349 Pa. (p. 53a) and Judge Boyle in this appeal (p. 3a), which are not excepted to.

The trustee sold 300 shares of the 783 shares of common stock, leaving 483 shares of common still in the trust. (The distribution of these proceeds are not involved in this litigation).

*INTACT VALUE of old shares*

| | | |
|---|---|---|
| 778 | shares of preferred stock at $100 | $77,800.00 |
| 483 | shares of common stock at $158.80 | 76,700.40 |
| | | $154,500.40 |

With the above stock in the trust, and with its *intact value* (as of date of death) as above, the merger and exchange of stock took place as described in *King Estate,* 349 Pa. 27, 28, 36 A. 2d 504: "The preferred stock had arrearages for dividends undeclared. The corporation effected a recapitalization and merger with two of its wholly owned subsidiaries. The trustee exchanged each share of preferred stock, with accrued dividend arrearages, for one-half share of 5% cumulative preferred stock, Series A., one-half share of 5% cumulative convertible preferred stock, Series B., and one and one-quarter shares of no-par common stock; each share of $100. par common stock was exchanged for one share of no-par common stock.

"The recapitalization and merger did not affect the capital nor increase or decrease the surplus. The assets and financial situation of the corporation remained unchanged. The trustee, owner of the stock, neither gained nor lost by the transaction. The same property interest was represented by the new certificates of stock that had been indicated by the old. There have been no stock dividends declared, no corporate dissolution, no distributions of corporate assets, and no sale of any of the new stock by the trustee."

(NOTE: In the merger there was *no change in assets;* the *assets* in the reorganization were *identical and remained as theretofore;* there was *no new contribution of capital.*)

*INTACT VALUE OF NEW STOCK*

Intact value of *old* shares (as above) ..... $154,500.40
Intact value of *new* shares therefore was:

389 shares Class A
preferred at
$100      $38,900

389 shares Class B
preferred at
$100      38,900

            $77,800

1455 shares of *new*
common at $52.71 ....... 76,700.40

                154,500.40

(NOTE: 483 shares old common at $158.80, total $76,700.40, is equivalent, *with identical assets,* to 1455 new shares at $52.71, $76,700.40.)

The trustee sold 178 shares of preferred (intact value $100 per share), *at $70* and 1000 shares of common (intact value $52.71) *at $21.67,* with the following result:

INTACT VALUE

178 shares preferred at *$100* ..... $17,800
1000 shares common at *$52.71*..... 52,710

          $70,510

SALE PRICE

178 shares pfd. at $70 ........... $12,460
1000 shares common at $21.67..... 21,670

          34,130

*IMPAIRMENT OF INTACT VALUE* .......... $36,380

*As the loss above in the intact value, to wit, $36,380, exceeded the amount of the proceeds from the sale, all of the fund here accounted for should be awarded to principal, which was done by the court in banc below* as we directed in our former decision. The decree of the court below should not be reversed or modified because the court in banc did precisely what this Court directed should be done. It is for this reason I dissent.