Miller v. Miller.

## CORPORATIONS—PARTIES—WILLS.

[Cuyahoga (8th) Circuit Court, December 2, 1912.]

Marvin, Winch and Niman, JJ.

HENRY C. MILLER AND SAMUEL C. D. JOHNS, TR. v. MORTIMER H. MILLER ET AL.

1. **Parties Defendant Financially Interested in Determination of Proceeding to Construe Will Excluded as Witnesses.**

   Parties defendant in an action brought by trustees to construe a will, in the determination of which their financial interests are involved and whose rights will be affected by the decision of the court, are properly excluded as witnesses under Gen. Code 11495.

2. **"Lawful Heirs" Determined as of Time of Testator's Death, not at Time of Contingency Happening.**

   "Lawful heirs," in a devise of testator's estate, one-half to the lawful heirs of testator and one-half to the lawful heirs of his wife, being the respective brothers and sisters of each, also certain of their children named, to whom, after the death of his son without living issue, the estate is directed to be distributed, refers to those who answered the description at testator's death, excluding the widow and son of testator, and not at the happening of the contingency of the son's death; hence, distribution should be made respectively, per stirpes, the representatives of the deceased brothers and sisters taking the share that would have gone to their deceased ancestor if living, except where the will provides such shares shall not go to certain specified persons.

3. **Testator's Recital of Domicile in Will Strong Evidence of Fact.**

   A declaration of testator's domicile in his will establishes that fact unless overcome by positive proof to the contrary; accordingly testator in his will having recited his residence in Ohio, notwithstanding he had resided in another state and owned and accumulated personal property therein, in the absence of evidence of intention to make that state his domicile, distribution will be determined by the laws of this state.

4. **Stock Dividends Declared out of Earnings Treated as Capital Stock and Distributed to Remaindermen not Life Tenants.**

   Stock dividends declared by a corporation out of earnings retained by such corporation and treated as part of its capital go to the remaindermen and not to the life tenants, and this notwithstanding certain earnings were accumulated and carried as cash or invested in securities capable of ready conversion into cash, if such funds were devoted to the extension and promotion of the company's business.

[Syllabus approved by the court.]

Cuyahoga County Circuit.

APPEAL from common pleas court.

*Stearns, Chamberlain & Royon,* for plaintiffs.

*Higley & Maurer, Westenhaver, Boyd, Rudolph & Brooks, Hoyt, Dustin Kelley, McKeehan & Andrews,* for defendants.

## NIMAN, J.

This action was brought by the trustees of the estate of Nathan E. Chapman, deceased, to obtain a construction of the will under which they are acting as trustees.

Nathan E. Chapman died January 13, 1893, leaving the will in question, which was admitted to probate by the probate court of Cuyahoga county, Ohio, on February 15, 1893. Letters of trusteeship were subsequently duly issued to the plaintiffs who qualified as trustees and have ever since continued to act as such.

The third paragraph of the will in question reads as follows:

"It is my will, that said trustees shall hold all the real estate, securities and moneys, of which I may die seized, with power to sell and convey said real estate, and to sell, dispose of or collect all of said securities, and to invest and reinvest the proceeds thereof, and after paying expenses, to pay the entire net income from my said estate, to my wife, during her lifetime. And it is my will, that if it becomes necessary, in the judgment of said trustees, to use any part or all of the principal, of my estate for the support and care of my wife, that the same shall be so used.

"At the decease of my said wife, it is my will, that the entire net income from my said estate, shall be paid by said trustees, to my said son, Harry, during his natural lifetime, should he survive his mother. And should said trustees, or their successors deem it necessary, at any time, after the decease of my said wife, to use any portion of the principal of my said estate, for the support and maintenance of my said son, Harry, they are authorized to so use the same. And should my son die, leaving issue, then at his death, should he survive his mother, or at his mother's death, should she survive him, said net income to be paid to the proper guardian of said issue, until it or they arrive at the age of twenty-one years, and to them become the absolute property

Miller v. Miller.

of said issue.   But, if my said son shall die, without living issue, then, after his death, if he survive his mother, or after his mother's death, if she survive him, or after the death of his issue, should it or they die before arriving at the age of twenty-one years, it is my will, that all my estate, shall go, one-half to my lawful heirs, and one-half to the lawful heirs of my wife, subject however to the following conditions:

"Should my son's wife survive both my son and my wife, then it is my will that one-fourth of my said estate shall still remain in trust, she to be paid by said trustees, the net income of said one-fourth, during the time that she remains the widow of my said son; and that the remaining three-fourths of my said estate be then and there divided between my heirs and the heirs of my wife, as aforesaid; provided, however, that if my sister, Mary E. Buckland, should survive me, then it is my will, that the share that she would receive at law, should remain in trust in the hands of my said trustees, she to receive the income therefrom during her lifetime, and at her death, said share to be paid to and vest in her daughter and the heirs of her daughter, Maria. It is my will, that no part of my estate shall ever go to my said sister's son, George.   And provided, further, that the share that would go to Mary A. Solloway, sister of my wife, shall remain in trust during the lifetime of said Mary A. Solloway, she, during said time to receive the net income from said share, and at her death, it is my will that said share should go to the other heirs of my said wife, excluding therefrom the children of the said Mary A. Solloway, it being my will that the said children of the said Mary A. Solloway shall inherit or receive no part of my estate.   And provided further, that the part of my estate which would go to Mitchell H. Miller, brother of my wife, shall be held in trust during the remainder of his lifetime, by said trustees, he to receive the net income therefrom, and at his decease, the same to go to his children.   And it is my will, that in the event one-fourth of my estate shall remain in trust for the benefit of the wife of my said son, as above provided, then at her marriage or decease, as aforesaid, said one-fourth to be disposed of in the same manner provided above for said three-fourths."

The testator was survived by his wife, Fannie E. Chapman,

who died March 10, 1908, and by his son, Harry E. Chapman, who died November 17, 1910, without issue living. The testator had four brothers and one sister. The brothers were:—William H. Chapman, who died August 18, 1895; Nelson C. Chapman, who died December 1, 1896; Dana B. Chapman, who died November 22, 1865; Charles W. Chapman, who died March 10, 1884; the sister was Mary E. Buckland, who died January 18, 1905.

The two brothers, who died before the testator, left children who were living at the time of the testator's death. The brothers and sister who survived the testator, each left children living, or their representatives.

Fannie E. Chapman, wife of the testator, had two brothers and three sisters, as follows:

Mitchell H. Miller, Henry C. Miller, Mary H. Solloway, Josephine A. Johns and Nettie Heckman, all of whom were living at the time of the death of the testator.

Mitchell H. Miller died March 17, 1905, leaving two sons and a daughter.

The plaintiffs seek the judgment and direction of the court in regard to the construction of the will upon four matters. There being, as we understand, no disagreement among the parties to this action with respect to the last three of the questions propounded in the petition, we are required to consider only the first, which is stated in the petition in the following language:

"Whether the interest and estate of the said heirs vested in them at the time of the death of the testator, or whether the interest and estate of said heirs was contingent until the death of the said son of the testator, in November, 1910, and it being determined whether said interest or estate in said heirs was vested or contingent at the time of the death of testator, whether the said heirs now take their inheritance *per capita* or *per stirpes.*"

In addition to this question, another, which has been injected into the case by the cross petitions of the defendants, and which has become the principal question for decision, is:

"Whether any part of a large amount of money received by the trustees upon the distribution of the assets of the Latrobe Steel Company in which the trustees held stock, should be

Miller v. Miller.

treated as income belonging to the life tenants under the will, or as a part of the corpus of the estate to be distributed among the remaindermen." The facts that give rise to this question will be stated hereafter.

Before passing to the consideration of the questions suggested, it is necessary to rule upon the objection made to the competency of the witnesses:—Mary Solloway, Josephine Johns and Nettie Heckman.

These witnesses are all defendants in the action and interested in the construction of the will and the determination of the questions involved in this action. Their financial interest will be affected by any order made by the court in respect to the fund in the hands of the trustees. If it is decided that a portion of this fund is income, which should go to the representatives of Fannie C. Chapman, and Harry E. Chapman, these parties would receive less, under the provisions of the will, than they would receive if the contrary decision is reached. Their testimony is directed largely to the subject of the domicile of the testator. Objection is made on behalf of the defendant, J. B. Wilbering, administrator de bonis non, of the estate of Harry E. Chapman, deceased, to their competency as witnesses; the objection being based upon the provisions of Gen. Code 11495.

In our opinion, the objection is well taken and their testimony will be excluded. Objection was originally made to the competency of the witness, Henry C. Miller, one of the trustees, and one of the plaintiffs in the action. This objection, however, has been withdrawn by all parties interested and it is therefore unnecessary for us to rule on the competency of this witness.

The first question propounded by the petition, wherein the judgment and direction of the court are sought, requires a determination of the question; whether the persons embraced within the words "heirs at law" used in this will, are to be determined as of the date of the testator's death, or as of the date of the death of the last of the life tenants, Harry E. Chapman.

It will be noticed that the language of the will is: "but if my said son shall die without living issue, then after his death it is my will that all my estate shall go one-half to my lawful

heirs, and one-half to the lawful heirs of my wife, subject however to the following conditions."

It is contended on the one hand that the term, "heirs at law," as used in this will, refers to those who answered that description at the time of the testator's death, excluding the widow and son of the testator, and, on the other hand, it is contended that the "heirs at law" must be ascertained as of the happening of the contingency upon which the distribution provided for in the will is to take place, which, under the facts before us, was the death of Harry E. Chapman.

The problem, in this case, as in all other cases involving the construction of a will, is to ascertain the intention of the testator.

In *Stevenson* v. *Evans*, 10 Ohio St. 307, 311, of the opinion, it is said:—

"If the intention of the testator, collected upon the face of the will, can be carried into effect according to the principles of law, it is undoubtedly the duty of the court to do so. The proper course, therefore, will be to ascertain, if we can, upon the face of the will, the intention of the testator, and if the intention, so ascertained, interferes with no rule of law, our duty will have been discharged.

"It is not claimed that we are prohibited, by any technical meaning given to any particular words used by the testator, from regarding all the languages and all the provisions of the will in deciding upon his intention. We are at liberty to look at the whole will and each provision to ascertain the intent, and the only point made has been, that the true intent requires the creation of estates or interests which the law does not permit."

Seeking from all the language of the will, the expressed intention of the testator, we find, first, that it was his clear intention to exclude his widow and son from those embraced within the expression "heirs at law."

In *Jones* v. *Lloyd*, 33 Ohio St. 572, it was held in paragraphs three and four of the syllabus, as follows:

"The term heirs, when used in a will, is flexible, and should be so construed as to give effect to the manifest intention of

Miller v. Miller.

the testator as ascertained by a due consideration of all the provisions of the will.

"Where a testator makes a provision for his wife, in lieu of dower, and directs that, in the event of her claiming dower, the balance of certain personal property bequeathed for her support 'shall be shared equally among my heirs,' the words 'my heirs' will be construed as meaning my next of kin, or any heirs according to the statute of distribution, exclusive of my wife, though his wife, in case of intestacy, would under the statute, have taken all such personal property."

A further indication of the intention of the testator is furnished by the provision of the will, "that if my sister, Mary E. Buckland, should survive me, then it is my will that the share that she would receive at law, should remain in trust in the hands of my said trustees, she to receive the income therefrom during her lifetime, and at her death, said share to be paid to and vest in her daughter, and the heirs of her daughter, Maria." Further provisions of the will to the effect that no part of the testator's estate should ever go to his sister's son, George, and that the share that would go to Mary A. Solloway, sister of his wife, should remain in trust during the lifetime of the said Mary A. Solloway, and the provisions excluding from the benefits of the will, the children of the said Mary A. Solloway, and providing for the holding in trust of that part of the estate that would go to Mitchell H. Miller, brother of the testator's wife, and after his death, the same to go to his children, express an intention on the part of the testator to indicate his brothers and sisters as "his heirs at law," and the brothers and sisters of his wife, as the "heirs at law of his wife."

If it were not for these expressions of intention, the direction of the will that after the happening of certain contingencies, "all my estate shall go, one-half to my lawful heirs and one-half to the lawful heirs of my wife," would probably be controlled by the rule of interpretation laid down in *Barr* v. *Denney,* 79 Ohio St. 358; but the testator having by his own language indicated the class intended by him to be embraced within the designation "heirs at law," as we think he has, it is

the duty of the court to adopt that construction of the will which expresses the testator's intention.

We, therefore, hold that the testator, by the use of the words "lawful heirs" intended to designate his brothers and sisters and the brothers and sisters of his wife, and it is the judgment and direction of the court that the division shall be made among those who were living at his or her death, respectively, *per stirpes*, the representatives of the deceased brothers. and sisters taking the share that would have gone to their deceased ancestor, if living, except where the will provides that. such shares shall not go to certain specified persons.

Coming to the consideration of what is considered the principal question in this action, namely—whether certain funds, received by the trustees upon the liquidation of the Latrobe Steel Works, shall be treated as a part of the corpus of the estate to go to the remaindermen, it becomes necessary to recite certain of the facts appearing from the evidence.

At the time of the testator's death, January 18, 1893, he was the owner of 250 shares of the capital stock of the Latrobe Steel Works, of the par value of $100 per share. The Latrobe Steel Works was a Pennsylvania corporation with a capital stock. paid in of $600,000.

Until a short time before his death, the testator was a director of the company, and employed by it as a salesman. Prior to the testator's death, no dividends had been paid on the stock;. the first dividend paid thereon being in February, 1894; on September 30, 1892, the corporation had a surplus of $187,386.16. The 250 shares left by the testator were taken over by the trustees and carried by them as a part of the trust estate. On November 1, 1895, another company was organized, known as the Latrobe Steel Company, and by action of the directors of the Latrobe Steel Works, and with the written consent of all the stockholders, the Latrobe Steel Works transferred all of its property and business to the new company which had a capital of $1,500,000 and there was issued to each stockholder of the old corporation, two shares of the new company for each one held in the original corporation. The trustees thus received 250 ad-

Miller v. Miller.

ditional shares of stock which were paid for entirely out of the surplus accumulations of the Latrobe Steel Works.

In 1898, a corporation with a capital stock of $300,000, known as the Latrobe Steel and Coupler Company, was organized under the laws of the state of Illinois, and property in Chicago turned in to this corporation. All of the stock of this new company was owned and held by the Latrobe Steel Company and the board of directors and officers of both companies were the same. The Latrobe Steel Company enjoyed a prosperous business and paid regular dividends for a period of about ten years. In some years, the dividends were as high as 10 per cent, semiannually.

In addition to the payment of large dividends, the company accumulated a large surplus of which $2,200,000 was in cash, or in securities easily convertible into cash, which were carried on the books of the company under the name of "contingent capital."

This fund was created and carried according to the testimony of Marriott C. Smythe, president of the company, as a sort of "war fund" to be used by the company in protecting itself in case of severe trade competition, to which it had been subjected in the early period of its existence. No part of this fund of $2,200,000 seems to have been actually employed in the conduct of the business, except that it was placed on deposit and drew interest and was invested in securities easily convertible into cash.

On November 1, 1905, the Latrobe Steel Company sold its physical assets to the Railway Steel Spring Company for $4,300,-000 in cash. The assets sold at this figure had previously been carried on the books of the company at $1,039,819.80. Upon the books of the corporation the sale was treated as a conversion into cash of the various items comprising the assets sold and the profit upon the transaction of $3,260,080.20, was entered upon the books to the credit of "profit and loss."

In 1908, the company sold the stock of the Illinois corporation for $1,243,000 cash. The sale of the various property of the Latrobe Steel Company, together with other assets owned by it, which were all converted into cash, left the total cash assets of

the sum of $8,549,250. This money was distributed among the stockholders. In January, 1906, four distributions were made, each distribution being equal to the face value of the stock held by each of the stockholders. Other payments were made to the stockholders until the money was all disbursed. All of this money was treated as a single fund and distributed among the stockholders as a part of the assets of the corporation. The checks were marked "An account of liquidation," and the stock was all turned in and indorsements of the various sums distributed made on the certificates. The trustees of the estate of Nathan E. Chapman received as their share of the fund distributed, the sum of $287,000.

It is contended on behalf of the representatives of the life tenants that a large porportion of the 250 shares of stock of the Latrobe Steel Company, received by the trustees in addition to the stock representing the original 250 shares, should be treated as income belonging to the life tenants and that a large part of the amount received by the trustees as a result of the transaction of 1905, over and above the original investment, represents profit or income which likewise should go to the life tenants. These contentions are combated by the remaindermen who contend that the entire fund of $287,000, received by the trustees, belong to the corpus of the estate.

It is claimed on behalf of the representatives of the life tenants that their contention is supported by the laws of Pennsylvania and that the domicile of the testator at the time of his death was in Pennsylvania, which makes necessary the application of the laws of that state in determining the distribution of the fund in question.

Under the evidence in this case, we hold that the domicile of the testator at the time of his death, was in Ohio. While he resided in Philadelphia his residence there is not shown to have established his domicile in the state of Pennsylvania.

In *Price v. Price*, 156 Pa. St. 617 [27 Atl. Rep. 291], it was held:

"Domicile is acquired by actual residence, coupled with the intention to reside in a given place or country, and cannot be acquired in any other way. If the intention of permanently

Miller v. Miller.

residing in a particular place exists, a residence in pursuance of that intention, however short, will establish a domicile.

"Domicile of original must be presumed to continue until another sole domicile has been acquired by actual residence, coupled with the intention of abandoning the domicile of origin. This change must be *animo et facto,* and the burden of proof is on the party who asserts the change."

In this connection, we think that great weight should be given to the recital in the will itself in which the language is: "I, Nathan E. Chapman, of the City of Cleveland, County of Cuyahoga and State of Ohio." It has been held that declaration made in a deed or will on the subject of domicile at a time when there is no dispute about the matter is evidence of the highest character and establishes a domicile unless overcome by positive proof to the contrary. *Ennis* v. *Smith,* 55 U. S. (14 How.) 400 [14 L. Ed. 472]; *Merrill* v. *Morrissett,* 76 Ala. 433, 440; *Ward* v. *Oxford,* 25 Mass. (8 Pick.) 476.

This view of the evidence renders it unnecessary for us to decide whether the question of domicile was necessarily involved in the judgment of the probate court in admitting the will to probate although in our opinion there is great force in the contention that the question of domicile was involved in the judgment of the probate court, and that such judgment can not be attacked collaterally.

The distribution of the fund in the hands of the trustees must therefore be determined by the laws of Ohio and that distribution will depend upon the rule which we adopt in deciding whether any part of said fund shall be treated as income or whether the whole should be regarded as belonging to the corpus of the estate. The question is a new one in this state but has been before the courts in numerous cases in other states.

There is much conflict in the results reached in various jurisdictions as well as in the principles resorted to in reaching those results.

In Pennsylvania, the rule of apportionment between life-tenant and remaindermen has been established. Under this rule, where the dividends, whether in cash or in stock, have been earned before the death of the testator, they are held to be a

part of the corpus of the estate and belong to the remaindermen; but if earned after the life estate began, they are held to be income and go to the life tenant, and if earned partly before and partly after the death of the testator, the earnings are apportioned between life tenant and remainderman. *Earp's Appeal*, 28 Pa. St. 368.

In *Smith's Estate*, 140 Pa. St. 344 [21 Atl. Rep. 438; 23 Am. St. Rep. 237], the rule enunciated in *Earp's Appeal* is restated in the following language:

"When the stock of a corporation is by the will of a testator given in trust, the income thereof for the use of a beneficiary for life with the remainder over, surplus profits which have accumulated in the lifetime of the testator, but which are not divided until his death, belong to the corpus of the estate, whilst the dividends of earnings made after his death, are income and payable to the life tenant no matter whether the dividend be in cash, or scrip or stock."

This rule, with various modifications and qualifications, has been adopted in a considerable number of other states.

In Massachusetts, a different rule has been established. There it is held that cash dividends are regarded as income and stock dividends as capital, without reference to the time they were earned or declared.

This rule was first laid down in the case of *Minot* v. *Paine*, 99 Mass. 101 [96 Am. Dec. 705]. On page 107, it is stated in the opinion:

"It is obvious that, if the directors had made no stock dividends, but had invested the income in permanent improvements, making no increase of the number of shares, the improvements would have been capital, belonging to the legatees in remainder. So, if they had thus invested it, and instead of increasing the number of shares, had increased their par value, the shares would have been mere capital, and not income, as to the stockholders, though increased in value by the application of the net income of the road, to that purpose. So when they increase the number of shares, each share of all the stock in the corporation is in its nature, capital. The new shares take their place among the old ones; and each of the old shares thereby

Miller v. Miller.

becomes a less proportion of the whole stock than it was before, and is entitled to a less proportion of dividends declared than it was before. It may be that dividends are less per cent than they would otherwise have been, and in such case the old stock is diminished in value, and the interest of the remaindermen is injuriously affected. But, on the other hand, the effect may be, by increasing the business of the road, to increase the dividends and the market value of the old stock.

"But neither courts nor trustees can investigate such matters with accuracy; and in many cases no investigation can be made. A trustee needs some plain principle to guide him, and the *cestui que trust* ought not to be subjected to the expense of going behind the action of the directors, and investigating the concerns of the corporation, especially if it is out of our jurisdiction. A simple rule is to regard cash dividends, however large, as income, and stock dividends, however made, as capital."

"The court are of the opinion that this rule is more in conformity with the legal and equitable rights of shareholders than any that has been suggested."

The rule as stated in *Minot* v. *Paine, supra,* that cash dividends, however large, should be regarded as "income" and stock dividends, however made, as "capital," has been somewhat restricted even in Massachusetts, for under later decisions the court inquires as to the circumstances under which the distribution was made in order to ascertain whether there has, in fact, been a capitalization of earnings. Capitalized earnings which have been distributed in the form of shares of stock have been held to be capital and cash dividends to be income. The Massachusetts rule has been followed in many states.

The latest decision called to our attention, bearing on the question under consideration is that of *Bryan* v. *Aikin,* 82 Atl. Rep. 817 (Del. Ch.), decided April 1, 1912.

In that case a will, executed by a testator, gave certain corporate stock to trustees to pay the net income, interest and dividends to grandsons for life, with remainder over upon the death of the survivor. The corporation declared a stock dividend out of the earnings and it was there held:

"The increase in the value of corporate stock resulting

from accumulations of earnings becomes a part of the corpus of the fund invested, and the increased value should be added to the corpus if the stock be sold, and the income on any other investments of the proceeds made, be paid to the life tenant, leaving the principal as reinvested to go to the remaindermen.

"Where corporate stock is bequeathed to trustees in trust, to pay the income and dividends to one for life, with remainder of the stock over, dividends in form of stock, representing earnings used during the life tenancy to increase the business plant of the corporation and distributed pro rata to the stockholders, belong to the remaindermen as a part of the corpus."

The rule that stock dividends declared by a corporation out of earnings retained by the corporation and treated as a part of its capital, should go to the remaindermen and not to the life tenant meets with our approval.

If the stock distributed in 1895, upon the promotion of the Latrobe Steel Company and the taking over of the assets of the old company, be considered as a stock dividend, it should in accordance with the conclusion we have reached, go to the remaindermen and the same result is reached even if this should not be considered in its strict sense a "stock dividend." There was at any rate a capitalization of all the earnings and assets of the Latrobe Steel Works and the issuance of an increased number of shares in the new company to stockholders of the old, did not in any way affect the interest of the stockholders in the property of the corporation. They had the same proportionate interest therein after the receipt of the increased number of shares as before.

In determining whether or not any of the fund of $287,000 received by the trustees upon the liquidation of the Latrobe Steel Company, should be regarded as income belonging to the life tenants or whether it should all be treated as a part of the corpus of the estate, it is important to notice that none of this money was distributed in the form of dividends or earnings.

Until the time of the liquidation, the earnings of the corporation belonged to the corporation itself and not to the stockholders, except as they had an interest therein represented by

Miller v. Miller.

their shares of stock. The power of a corporation, either to distribute its corporate earnings to stockholders, or withhold them for the purpose of extending the corporate business, is not subject to judicial control in the absence of bad faith.

The corporation here saw fit to retain its earnings and use them in the extension of its business. It might, if it had seen fit, have declared dividends out of its earnings in addition to the liberal dividends paid from time to time, but it did not see fit to do so. It appears to have capitalized its earnings and to have used them in furthering the interests of the company's business.

It has been contended that the socalled "war fund" of $2,200,000 was clearly income and although carried on the books as contingent capital, was nevertheless earnings in which the trustees had an interest in proportion to the stock held by them and which interest should go to the life tenant.

It is true as shown by the testimony of Mr. Smythe, that this fund was accumulated and carried as cash or invested in securities capable of being converted into cash on short notice; but it was nevertheless devoted, in our opinion, to the extension of the business and the promotion of the company's welfare as effectually as if it had been invested in the company's plant, or in other forms of property used in the business in which it was engaged. We think that it was a part of the capitalization of the company and that upon final distribution of the assets of the corporation, it was impressed with the same character as the other assets.

It seems to us that great difficulty would follow the adoption of any principle of law that would require the courts to investigate the affairs of a corporation and determine what part of its assets should be considered as income or surplus or accumulations, under whatsoever name, and what as a part of the capital of the corporation.

In view of the undoubted power of a corporation to distribute or withhold earnings from stockholders, to employ them in the extension, improvement and increase of the material business facilities of the corporation, and thereby permanently capitalize them, it seems wise to adopt the rule that treats the

Cuyahoga County Circuit.

assets of a corporation upon liquidation as the corporation it-self has treated them, in the absence of bad faith.

The chancellor in the case of *Bryan* v. *Aikin, supra,* in adopting the rule which we follow, said on page 823:

"The rule here adopted has merit, not only as being con-cededly simple and direct, but represents a logical conclusion from established premises. It gives weight to the action of the company, because the corporation has the power to settle the premises upon which the question is to be decided. It avoids an investigation into the transactions of the company to de-termine the period within which the earnings were made and on numerous occasions, it has been pointed out by courts which have rejected the apportionment rule of Pennsylvania that this is always troublesome, usually expensive, seldom satisfactory and sometimes practically impossible, as in the case of a foreign corporation. Of course, these references to some of the diffi-culties of adopting a rule as to apportionment, according as the earnings were made in whole or part during the life of the testator, or wholly or partly thereafter, do not apply in the case at bar, because it affirmatively appears that all the earnings represented by the stock dividend in question was made since the life tenancy began. Still a plain simple rule is sought, and one that is workable in all cases to prevent controversies and to guide in the administration of other estates respecting other distributions of capitalized earnings. The rule has been criticized because it gives too much weight to the action of the corporation, but this is a necessary result of the character of the investment and of the necessary power of the corporation respecting the management of the assets of the company. The rule here adopted is clear, easily applied and logical and as fair to present interests as the nature of the case will permit, in view of the corporate control of corporate property."

The language, above quoted, meets with our approval. We think that the adoption of this rule is in accord with the in-tention of the testator. He was a director in this company un-til a short time before his death and may be assumed to have been familiar with the power of corporations to accumulate their earnings and use the same in the conduct of their business,

Miller v. Miller.

rather than to distribute them among stockholders as dividends.

In his will, he conferred power upon his trustees "to sell, dispose of and collect, all of said securities and to invest and reinvest the proceeds thereof, and after paying expenses, to pay the entire net income, etc."

He, therefore, contemplated a situation where some increase in value of his investment in this corporation might arise and a sale become profitable.

It was evidently his intention in such case that the increase in value should be added to the corpus of his estate and be reinvested.

The conclusion reached renders it unnecessary for us to determine the effect of the transactions between the trustees and the life tenants, Hattie E. Chapman and Harry E. Chapman, which was claimed to constitute an accord and satisfaction or an agreement to consider all the funds in the hands of the trustees, at the time of the transaction, as belonging to the corpus of the estate.

No matter what view we take of the instrument signed by the life tenants, it can have no effect upon this decision in view of the rule which we adopt.

As to the attack made on the appointment of J. B. Wilberding, administrator *de bonis non* of the estate of Harry E. Chapman, we are of the opinion that the probate court had power to make such an appointment and that the same cannot be collaterally attacked in this proceeding.

All questions of account on the part of the trustees should be passed upon by the probate court and no ruling is made by this court upon any item of said account.

In accordance with the conclusion announced, the trustees are directed to distribute the entire amount received by them on the stock of the Latrobe Steel Company, upon its liquidation, in accordance with the terms of the will, as a part of the trust estate belonging to the remaindermen.

**Marvin** and **Winch, JJ.,** concur.