them afforded, in our opinion, any ground for a reversal of the judgment. The first specification was founded upon a sentence from the charge in the following words : "There was too much of a breast on a high water, catching so much of the current of the stream, and of course increasing the strain upon the lines." A reference to that part of the charge from which the sentence was taken was not expressive of the opinion of the judge but was a statement of the plaintiffs' contention. The second specification hints at inadequacy in the charge with an intimation of partiality in the instruction to the jury. It seems to us, however, that the charge was impartial and fair. The specifications are therefore overruled.

Judgment affirmed.

## Connolly's Estate (No. 1).

198   137<br>201   525

*Life estate—Income and principal—Stock—Undivided surplus profits.*

A person having a life estate in the stock of a corporation is not entitled to the enhanced value of the stock due to undivided surplus profits. Such enhanced value belongs to the remainder-man. Where dividends are declared on the surplus earnings, the legatee for life is entitled only to the proportion of such earnings as accrued subsequently to the testator's death.

Argued Oct. 24, 1900. Appeal, No. 102, Oct. T., 1900, by E. H. Flick and Sadie F. Rodgers, executors of Sarah Connolly, deceased, from decree of O. C. Allegheny Co., Nov. T., 1899, No. 65, dismissing exceptions to adjudication in Estate of Martin Connolly, deceased. Before McCollum, C. J., Mitchell, Fell, Brown, Mestrezat and Potter, JJ. Affirmed.

Exceptions to adjudication.

The facts appear by the opinion of Over, J., which was as follows :

Martin Connolly died testate on November 23, 1874. In a holographic will dated May 1, 1870, he made the following provisions :

" I, Martin Connolly, being of sound mind and judgment,

and being about to make a voyage to Europe for the benefit of my health—accompanied by my beloved wife, Sarah—lest any accident befall us that might deprive us of life, I deem it proper and right to make this my last will and testament."

He appointed his wife, Sarah Connolly, Patrick Smith and Patrick McCullough executors of his will, and in the first section provided for the payment of his debts. In the second he directed that "All my real and personal property to remain for ten years as it now is, to be carried on by my executors same as if I was alive ; the proceeds of which to go into one common fund at interest, with nothing to come out of it after all expenses are paid." He then gave annuities of $500 each to a brother and sister during their lives.

In the third section he directed that "at the expiration of said ten years the product of my real and personal estate shall be divided as follows," and then gave certain pecuniary legacies.

In the fourth, fifth and sixth sections he devised certain real estate, and in the seventh made the following bequest: "To a home for destitute females or old persons, or any other institution Rev. Father Hickey may establish, I hereby give and bequeath the product of all my insurance and oil stocks."

In the eighth he devised real estate, and in the ninth and tenth made the following bequests:

"9th. To my cousin, John McGettigan and family, of Philadelphia, I give and bequeath $5,000, to be divided equally, including self and wife, to be taken out of Second National Bank at expiration of said ten years.

"Section 10th. The remaining $5,000 of Second National Bank stock, including increase, I give and bequeath to Willie Totten Connolly."

In the eleventh and twelfth sections he devised real estate, and in the thirteenth and last provided as follows: "Should my beloved wife, Sarah Connolly, survive me, to her I give and bequeath all my real and personal estate and moneys of which I am at present possessed, to have and to hold during her natural lifetime, with a request that she will not let my poor brother Charles and sister Sallie want for any comforts of this life ; but at the death of my wife, Sarah, or previous, it is my wish that this will be carried out to the letter, revoking all sections of this will and testament but No. 13."

His wife survived him, and, the other executors renouncing, took out letters on his estate, but never filed an account. She having died on April 7, 1899, her executors filed this account, in which they charge her estate with the amount of inventory of Martin Connolly's estate, $37,448.12, and claimed the following credits to which exceptions are filed:

Balance paid on demand notes given by M. Connolly for subscription to 110 shares stock in Allegheny Insurance Company, $1,260. Five per cent commissions, $1,697.37. Commission of Sarah Connolly's executors, two and one half per cent, on $25,745, $643.62. McNeil and Flick, professional services to said executors, $500. Rent paid T. C. Jenkins, $1,875.

Stocks on hand at their value at the time of Sarah Connolly's death, viz: Fifty shares Second National Bank stock, at $300 per share, $15,000; thirty-five shares Citizens' Insurance stock, at $47.00 per share, $1,645; seventy shares Monongahela Insurance Company stock, at $40.00 per share, $2,800; balance cash insurance on hand, $250. There were fifty shares of the stock of the Cash Insurance Company included in the inventory valued at $2,750.

On March 10, 1896, the company ceased business and went into liquidation. The following resolutions were passed by the board of directors:

On the 25th of May, one declaring "a dividend of ten per cent on the capital stock out of the contingent fund account, surplus earnings."

On July 7, 1896, one declaring "a dividend of ten per cent on the capital stock of the company out of the earnings of the last six months and the contingent fund account."

On January 25, 1897, declaring "a dividend of twenty per cent on the capital stock of the company out of the earnings of the last six months and the contingent fund."

On June 30, 1897, declaring "a dividend of twenty per cent on the capital stock of the company out of the contingent fund or surplus earnings."

In regard to these dividends the secretary of the company testified, "These were the extraordinary dividends," and although the resolutions differ somewhat in their wording, the dividends were evidently intended to be made out of the surplus earnings.

On October 27, the directors declared "a dividend of twenty-five per cent on the capital stock." By resolution of the board the president was authorized to convert the assets and distribute them, and made three divisions of twenty-five per cent of the capital stock. The secretary testified that there would probably be a further surplus dividend of ten per cent.

Mrs. Connolly received from dividends of the surplus earnings during the liquidation of the company, $1,500, and from division of the capital stock, $2,500, being the par value of the fifty shares.

She is charged with the stock at the appraised value of $55.00 per share, making for the fifty shares $2,750.

There were also included in the inventory 110 shares of stock of the Allegheny Insurance Company, appraised at $3,630, which the decedent owned when he made his will.

On July 8, 1878, Mrs. Connolly, as executrix, transferred this stock to herself, and it stood in her name when the company ceased business and went into liquidation on October 20, 1898.

The directors passed a resolution, instructing the officers of the company, "As soon as sufficient cash is on hand to pay out of our surplus a dividend of $25.00 a share to the stockholders," and pursuant to it, $2,750 was paid to Mrs. Connolly.

On June 27, 1899, another resolution was passed, "That a dividend of $9.00 per share be declared, payable July 24, 1899, provided the decree of dissolution is granted by the court, and the surplus, if any, to be given to the secretary for his services." This dividend, amounting to $990, was paid to Mrs. Connolly's executors.

On May 16, 1899, "a dividend of $50.00 per share was declared, payable on and after the 25th inst., the same being on account of liquidation of capital stock of this company." The check for this, amounting to $5,500, payable to the executors of Mrs. Connolly, is held by the officers of the company.

The accountant received in dividends after the company went into liquidation, $3,740, and there is a check made out to her executors in division of the capital stock for the sum of $5,500. In her account she charged herself with the inventory value of the stock, $3,630. Exceptions are filed by the Safe Deposit and Trust Company, to which letters d. b. n. c. t. a.

were granted on the estate after Sarah Connolly's death, it being claimed that she should be charged with the whole amount received in the liquidation of these stocks.

It is obvious from the will itself that the testator when he wrote it was apprehensive that both his wife and himself might die during their European trip; having this apprehension he proceeded in twelve sections of his will to dispose of all his estate. When he finished the twelfth, it seems to have occurred to him that his wife might survive him, and to provide for that contingency he wrote the thirteenth section, in which he gave his whole estate to her for life. He was illiterate and evidently did not know the meaning of the word "revoking" used by him in that section of the will, nor intend that all the twelve preceding sections should be revoked, but that their operation should be suspended during his wife's life, and that the bequests and devises there made should be subject to her life estate.

The fifty shares of Second National Bank stock referred to in the account were appraised at $5,550; the thirty-five shares of Citizens' Insurance Company stock at $1,400; and the seventy shares Monongahela Insurance Company stock at $2,660; the total being $9,610. The accountant is charged with them at their inventory value, and credit is claimed for them at their present value, $19,445. If it be allowed, her estate derives the benefit of their increased value, amounting to $9,835.

In the ninth and tenth sections of the will the testator specifically bequeaths the stock of the Second National Bank, giving $5,000 to be taken out of it to John McGettigan and family, the remaining $5,000, including increase, to Willie Totten Connolly, and the product of the insurance stock is specifically bequeathed in the seventh section to a home for destitute females or any other institution Father Hickey may establish.

It is contended that under Earp's Appeal, 28 Pa. 368, and similar cases, Mrs. Connolly, as legatee for life of these stocks, is entitled to the increase in their value, whether that results from accumulated earnings or enhancement in the value of the stock itself. In Earp's Appeal, Chief Justice LEWIS seems to have held that the surplus earnings of a corporation, whether distributed in dividends or not, accruing after the death of the

testator, belong to the legatee for life. He said: "The managers might withhold the distribution of it for a time for reasons beneficial to the interests of the parties entitled; but they could not by any form of procedure whatever deprive the owner of it and give it to others not entitled. The omission to distribute it semiannually, as it accumulated, makes no change in its ownership."

But as is shown in Moss's Appeal, 83 Pa. 268, the surplus earnings of this stock referred to in Earp's Appeal had been distributed amongst the stockholders, so that all that was said there as to undivided profits is mere dictum. In discussing that case in Moss's Appeal, page 269, Mr. Justice PAXSON said: "This case was exceptional in its character. As a general rule, nothing earned by a corporation can be regarded as profits, until it shall have been declared to be so by the corporation itself, acting by its board of managers. The fact that a dollar has been earned gives no stockholder the right to claim it until the corporation decides to distribute it as profits. The wisdom of such distribution must of necessity rest with the corporation itself. From motives of prudence and self-interest it is frequently desirable to add all, or a portion, of the earnings to the capital. This is sometimes necessary as a basis of credit for more enlarged operations. It is often a wise exercise of discretion for a corporation to strengthen itself in this way, and with such discretion a stockholder cannot interfere. His only remedy is by an appeal to the ballot at an election for directors. But where a corporation having actually made profits, proceeds to distribute such profits amongst the stockholders, the tenant for life would be entitled to receive them, and this without regard to the form of the transaction."

In all the cases cited by counsel in which Earp's Appeal has been followed, dividends of surplus earnings have been declared, and in most of the cases the question was whether the earnings which accrued prior to the death of the testator were part of the corpus, or income to be distributed to the legatee for life, and it was always held that they belonged to the corpus and should be distributed to the legatee in remainder.

Mrs. Connolly under the will was entitled to the income from the stock for life, and upon her death or at the expiration of ten years thereafter it or its product was specifically be-

queathed in remainder. Her rights were no greater than the testator's in his lifetime, and as he could not have compelled a distribution of the surplus profits in dividends she could not; and as she could not obtain them in her lifetime, surely her personal representatives after her death cannot, neither from the corporation nor the legatees in remainder.

In the second section of the will the testator directed that all his real and personal property should "remain for ten years as it now is." He evidently intended that none of the stocks should be sold before the period for distribution to the legatees in remainder should arrive, and the bequest he then made of the product of the insurance stocks shows that he did not intend that any deduction should be made from the proceeds of its sale for the undivided surplus profits, and in the tenth section he expressly gives the increase of the Second National Bank stock to the legatee in remainder. The increase in value of these stocks is no doubt due in part to surplus earnings retained by the corporation to give them financial standing and meet losses, and also in part to the enhancement of their original value. "Such enhancement belongs not to the tenant for life but to the remainder-man:" Eisner's Estate, 175 Pa. 143; and as there is no evidence here from which the proportions of the increase due to the surplus earnings and to the enhancement of the original value of the stock can be found, the dictum of Chief Justice Lewis in Earp's Appeal could not be followed. The credits claimed for the increased value of these stocks must therefore be disallowed, and they must be distributed in kind to the administrator d. b. n. c. t. a.

But as to the Cash Insurance and Allegheny Insurance Companies' stocks, these corporations having ceased business, the stock does not exist. No part of the fund distributed in their liquidation arises from its enhancement in value, and as dividends were declared on the surplus earnings under the rule laid down in Earp's and Moss's Appeal, supra, and Smith's Estate, 140 Pa. 344, the legatee for life is entitled to the proportion of such earnings as accrued subsequently to the testator's death. There can be no question that a portion accrued prior thereto, but it is perhaps difficult to fix the exact amount. The insurance commissioner's reports for the year 1874 show the amount of surplus earnings of the companies at the date of

the testator's death, and by taking this amount and dividing it by the number of shares issued, the result will be the amount per share. They were dividend paying stocks, and it is probable would have sold then for the amount paid in on the stock and its proportion of the surplus. This seems to be the only equitable way of adjusting the matter. The surplus of the Cash Insurance Company, as shown by these reports on December 21, 1874, was $61,390.07. This amount divided by the total number of shares—2,000—makes $30.69 for each share, and for the fifty shares, $1,534.50, which will be surcharged on account of surplus earnings accruing in testator's lifetime; but as the accountant is charged with the stock at $55.00 per share, and only received in its liquidation the par value of $50.00 a share, she will be credited with the difference, $250.

The Allegheny Insurance Company's stock was not paid up at the testator's death, and dividends thereon accruing after his death to the amount of $1,250 were applied to the payment of the balance due on the two notes of the testator, each having a surety thereon, given to the company for the amount due on the stock. The estate was liable for these notes, and as Mrs. Connolly paid them with dividends belonging to her, she is entitled to credit for their payment. She must be charged, however, with the stock at its par value of $50.00 per share, she having received that in the liquidation of the company, being $17.00 per share in excess of the inventory value, and also with the proportion of the surplus earnings which accrued prior to the testator's death. As shown by the report of the insurance commissioner, the surplus of the company on December 31, 1874, was $16,895. This divided among the total number of shares—2,000—makes $8.44 for each share, and on 110 shares, $928.40. The surcharge on account of this stock, then, will be $17.00 per share, excess received above the inventory value on 110 shares, $1,870; and surplus earnings accrued prior to testator's death, $928.40. This stock having been specifically bequeathed, the question was raised as to whether or not the amount paid by the executors on the notes should be charged against the fund realized from the stock. As the distribution here will not be to the legatees, but to the Safe Deposit and Trust Company, administrator c. t. a., the question cannot be decided now, but can be when its account is filed, when distri-

bution will be made to the legatees and their equities adjusted.

When the testator died he resided in a house in Allegheny city, under a lease made March 17, 1874, for two years, at a rental of $1,500 per year. The executrix continued to reside in this house until the expiration of the lease, and has claimed credit for all the rent paid by her. As she personally derived all the benefits from this lease after the testator's death, she should pay the rent accruing during that period, or, at least, after January 1, 1875, she having taken, as legatee for life, the lease with its burdens. It is no hardship upon her, as she would have been compelled to pay rent had she left this house and rented another. She can, therefore, only be allowed credit for payment of so much of the rent as accrued prior to the testator's death.

Although the commissions charged for the executrix are very liberal, we are not disposed to reduce them, but they are ample compensation for all services rendered, and the charge by her executors of commissions for themselves personally cannot be allowed.

Most of the services for which McNeil and Flick, nonresident counsel, claim $500, seem to have been rendered for the estate of Sarah Connolly, and we think $100 sufficient compensation for all services rendered for the estate of Martin Connolly by them, and this will be allowed.

*Errors assigned* were in overruling exceptions to adjudication.

*E. H. Flick*, with him *M. M. McNeil*, for appellant.—Under the law the principal, that is, the value of the stock at the time the life tenancy began, must remain unimpaired during the life tenancy; but the earnings and the increase arising after the death of the testator, and which accumulated during the life tenancy, and which remain undistributed by dividend at the death of the life tenant, belong to the estate of the life tenant: Earp's App., 28 Pa. 368; Park's Est., 173 Pa. 190.

*Henry A. Miller*, with him *J. N. Piatt*, for appellee.—The enhanced price for which stock sells, by reason of dividends

earned, but not declared, belongs entirely to the remainder-man: Eisner's Est., 175 Pa. 143; Scholefield v. Redfern, 32 L. J. Ch. 627; Middleton's App., 103 Pa. 92; Cook on Corporations, sec. 560; Whitney v. Phœnix, 4 Redfield (N. Y.), 180; Gifford v. Thompson, 115 Mass. 478; Abercrombie v. Riddle, 3 Md. Ch. Dec. 320; Van Blarcom v. Dager, 31 N. J. Eq. 783; Moss's App., 83 Pa. 269; Mut. Life Ins. Co. v. Girard Life Ins. Co., 100 Pa. 172; Weimer on Pa. Corporation Law, 342; Rose v. Barclay, 191 Pa. 594.

Surplus profits accumulated in a corporation during a testator's lifetime, but not divided until after his death, belong to the corpus of the estate.

PER CURIAM, January 7, 1901:

We affirm the decree complained of by the appellants on the clear and able opinion of the learned judge of the orphans' court.

Decree affirmed and appeal dismissed at the costs of the appellants.

---

## Connolly's Estate (No. 2).

Argued Oct. 24, 1900. Appeal, No. 103, Oct. T., 1900, by the Safe Deposit and Trust Company of Pittsburg, administrator d. b. n. c. t. a. of the estate of Martin Connoly, deceased, from decree of O. C. Allegheny Co., Nov. T., 1899, No. 65, dismissing exceptions to adjudication in the estate of Martin Connolly, deceased. Before McCOLLUM, C. J., MITCHELL, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Exceptions to adjudication.

The facts appear by the opinion of OVER, P. J., in the preceding case.

*Henry A. Miller*, with him *J. N. Piatt*, for appellant.

*E. H. Flick*, with him *M. M. McNeil*, for appellee.