**Pew Estate**

2

The facts appear from the following adjudication of TAXIS, P. J., March 27, 1958.—The second account of J. Howard Pew, J. N. Pew, Jr., and Mary Ethel Pew, trustees for Arthur E. Pew, Jr., as stated by J. Howard Pew, was examined and audited by the court on July 26, 1957, and January 20, 1958 . . .

The account shows a balance of principal for distribution in the sum of $944,735.11, composed of 26,798 shares of Sun Oil Company common stock, $682,986.29, 2,000 shares Sun Oil Company common stock due from Arthur E. Pew, Jr., carried at $50,972.80, cash due from Arthur E. Pew, Jr. of $210,645.71, and income on deposit of $130.31.

No part of the fund before the court upon the present accounting is subject to the payment of transfer inheritance tax.

Accountants have requested and there is herewith allowed additional credits totaling $210 for costs expended since the filing of the account.

Mary C. Pew created an irrevocable inter vivos trust on June 2, 1932, for Arthur E. Pew, Jr., and Walter C. Pew, her grandsons, and for the benefit of the children of these two grandsons. The trust provides that income from one-half of corpus is to be paid to Arthur E. Pew, Jr., for life with remainder to his children and other remainders not now necessary to recite. The other half of corpus is held for the benefit of Walter C. Pew and his children upon the same terms. Only the trust for Arthur E. Pew, Jr., is before the court in the present accounting.

Arthur E. Pew, Jr., the income beneficiary, filed two objections to this, the trustees' second account. The first objection complains that the trustees failed to apportion to income 6,359.75 shares of common stock of Sun Oil Company received on December 30, 1954. The trustees' account carried these shares in principal.

The second objection of the income beneficiary complains that the trustees failed to apportion the proceeds of sales of 3,179 shares of common stock of Sun Oil Company, which were sold between August 30, 1949, and July 22, 1955. The proceeds amount to $221,027.71. Trustees carried the entire proceeds as principal. The income beneficiary objects on the ground that the aforesaid proceeds of sale were apportionable to income, "... to the extent that such proceeds represented the undistributed earnings of Sun Oil Company applicable to such shares which earnings were accumulated during the period from June 2, 1932, (the date of the creation of the trust) to the aforesaid dates of sale."

The guardian and trustee ad litem also filed two objections to the account complaining of the inclusion in the account of principal disbursements to the life beneficiary labeled "Loans to Life Tenant," of $210,645.71 in cash, and 2,000 shares of Sun Oil Company stock listed at $50,972.80.

4

The objections of the income beneficiary raise for determination the question whether an apportionable event has occured concerning a share distribution of 6,359.75 shares of the Sun Oil Company stock received by the trustees on December 30, 1954. A stipulation of the pertinent facts concerning the apportionment problem was entered into by counsel for all the parties, which is now a part of the record and from which the following facts appear.

Upon creation of the trust Mary C. Pew, settlor, placed 40,000 shares of Sun Oil Company common stock in the trust corpus. On May 15, 1947, 8,000 additional shares were received. On October 29, 1947, the first account of the trustees was filed showing that 34,108 shares of Sun Oil Company stock had been received as stock dividends and had subsequently been distributed to the income beneficiaries. Subsequently an additional 5,280 shares were received, and by a decree of this court dated February 18, 1949, 3,236 shares were awarded to principal and the remaining 2,044 shares were awarded to income. Thus in 1949 a total of 51,236 shares of Sun Oil Company common stock was held in the trust corpus or 25,618 shares in each half of the trust. The trustees divided the corpus of the trust into two separate trusts in accordance with the suggestions set forth in the adjudication of February 18, 1949, one of which trusts was held for the primary benefit of Arthur E. Pew, Jr., and the other for Walter C. Pew. The present accounting reflects the transactions with respect to the trust for Arthur E. Pew, Jr., only, and sets forth receipt by the trustees of the 25,618 shares of Sun Oil Company stock, or one-half of the 51,236 shares awarded to the trustees.

From December 1947 until December 1955, the trustees annually received stock dividends ranging from six percent to 10 percent, and totaling 16,333.82

shares. 16,332.94 of these shares were distributed to the income beneficiary, and the remaining 88/100 share was sold and the proceeds, $64.24, credited to income. The stock dividend paid in January 1948, and all subsequent stock dividends, were subject to the New York Stock Exchange requirements, fully set out in the stipulation of facts, which provide that upon the issuance of a stock dividend the issuing company must transfer from earnings or earned surplus to the capital account an amount equal to the fair value, market value, per share of the stock issued as a dividend.

On December 30, 1954, the trustees received the 6,359.75 shares now in question. The scrip certificate representing 75/100ths of a share was sold on February 7, 1955, for $51.93, and the proceeds retained in principal.

The resolution of the board of directors of October 19, 1954, regarding this 1954 stock distribution provided in part: ". . . the Board of Directors of Sun Oil Company . . . does hereby resolve and declare that it is advisable that each four (4) shares of Common Stock, without nominal or par value, now issued and outstanding, shall be equal to and are hereby changed into five (5) shares of Common Stock, without nominal or par value, and the holders of said Common Stock . . . shall be entitled to receive one (1) additional share of said Common Stock, . . . for each four (4) shares of Common Stock held . . .".

The board of directors then called a special meeting of the stockholders for November 18, 1954, and on that date the stockholders approved this resolution. Then, on November 18, 1954, the board of directors adopted the following resolution: "Resolved, that the additional shares of Common Stock, without nominal or par value, to which holders of said Common Stock are entitled as a result of the split up of said Common

Stock authorized by the stockholders at a Special Meeting of stockholders held this 18th day of November, 1954 . . . be issued on December 30, 1954, to common stockholders of record at the close of business on November 29, 1954 . . .".

It is stipulated that: "There was no transfer of any amount from Earnings Employed in Business (earned surplus) to Capital Stock Account on the books of the Company during the year 1954 with respect to said additional shares of Common Stock. . . ." It is also stipulated that, for the various stock dividends received by the trustees during the time covered by the New York Stock Exchange rules, there was transferred to capital sufficient earned surplus to cover the fair market value of these shares, and that the amount so transferred exceeded the book value of these shares by $44,673,626.00.

It is the position of the income beneficiary that the 1954 Sun Oil transaction constituted an apportionable event and that therefore the shares should be credited to income, not principal.

The essence of the apportionability of a particular transaction was summarized by the Supreme Court in Nirdlinger's Estate, 290 Pa. 457, 473, where it was stated: " 'The fundamental principle involved in these questions is whether there has been a distribution or division of the earnings, profits or accumulations of the corporation. Until there has been such division, the life tenant is not entitled to any increase in the value of the principal of the trust fund, or the capital and assets of the corporation, shares of which constitute the trust fund.' "

The income beneficiary first argues that stock splits in general should be included among the list of apportionable events. A pure stock split, i.e., one not accompanied by a capitalization of earnings, reasons the income beneficiary, effects a division of accumulated

corporate earnings in the same manner as does a stock dividend, the issuance of which clearly constitutes an apportionable event. He contends that both transactions result in a "proliferation" of book value, and since the stock dividend is an apportionable event, so also should be the stock split. For example, if the stockholder owns one share of $100 par value stock of a company with $300 of earned surplus, and a two for one stock split occurs, there also occurs a division of earned surplus between each share, i.e., each share represents $50 of capital and $150 of earned surplus.

Although our Supreme Court has passed on the apportionability of numerous corporate transactions,* there has been to date no appellate expression holding that a pure stock split constitutes an apportionable event. One explanation for the absence of an appellate court ruling on this point in the face of the frequency and popularity of stock splits in the past years may be that the stock split has not been regarded by those interested and concerned as being an apportionable event. In the recent unreported adjudication in Harvey's Estate, O. C. of Philadelphia County, no. 3165 of 1940, April 24, 1957, Judge Saylor held that, in absence of the capitalization of earnings, a stock split does not constitute an apportionable event. He stated:

---

* Acts recognized by the cases as constituting a distribution or division of corporate earnings giving rise to apportionable events include a stock dividend (Earp's Appeal, 28 Pa. 368); a liquidation (Connolly's Estate, No. 1, 198 Pa. 137); the issuance of rights to subscribe to additional stock, whether subsequently sold by the trustee (Waterhouse's Estate, 308 Pa. 422); or exercised by the trustee (Hostetter's Trust, 319 Pa. 572); extraordinary cash dividends (Mandeville's Estate, 286 Pa. 368); dividends paid in stock of another corporation (Barnes' Estate, 338 Pa. 555); satisfaction of accumulated arrearages on preferred stock (King Estate, 361 Pa. 629); and the exchange of shares in a corporate reorganization: Daily's Estate, 323 Pa. 42.

"In the absence of the capitalization of earnings or of earned surplus there is no apportionable element in a stock dividend or a stock split. Cunningham's Estate, supra. See also King Estate, 349 Pa. 27 (1944).

"The conclusion above set forth is not altered by the fact that the corporations of which the stock is here involved reinvested large amounts of earnings in their respective businesses. Such reinvestment is not capitalization and the fund invested is still technically available for the payment of dividends. When the issue of stock is supported by earnings which have been capitalized, the amount of such capitalized earnings can not thereafter be distributed as dividends but must be retained by the corporation to continue to support the outstanding stock. It is the legal bar to distribution as dividends created by capitalization *which is the controlling element.*"

See Cunningham Estate and Harvey Estate, 13 D. & C. 2d 63, of court en banc; Frick Estate, 4 D. & C. 2d 247, 251.

Nor is there any provision in the A. L. I. Restatement of the Law of Trusts, 1948 Supp., §236, providing for the apportionment of stock splits. Similarly in New York, a jurisdiction which has adopted a modified form of the Pennsylvania rule of apportionment prior to statutory expression on the subject, stock splits have been excluded from the lists of apportionable events. See In re Lissberger's Estate, 71 N. Y. S. 2d 585, 18º Misc. 277.

Considering the definition of an apportionable event as set forth in Nirdlinger's Estate, supra, and in light of the fragmentary authority set forth above, it must be concluded that the pure stock split is not an apportionable event. It must be conceded that the income beneficiary's example outlined above does illustrate that the stock split effects, in a sense, a division of

earnings from the stockholder's point of view. However, this result does not appear to be the type of division and distribution of earnings contemplated by the apportionment cases. After the occurrence of the stock split the earnings of a corporation remain intact in an accumulated earnings account, undisturbed, unaltered and available for future stock dividends or cash dividends. It is true that more shares of stock represent these identical earnings after a stock split has occurred, but it is only the stock certificates representing the earnings that undergo a split or division, and not the earnings themselves.

The income beneficiary has accurately pointed out that a corporate capitalization of earnings is not in every case a prerequisite for the existence of an apportionable event. For example, the exercise of rights to subscribe involves no such capitalization but is definitely established nonetheless as being an apportionable event. See Jones v. Integrity Trust Co., 292 Pa. 149. However, it is not the absence of an earnings capitalization alone which requires the conclusion that a stock split does not constitute an occasion for an apportionment. Rather it is the fact that the stock split does not affect a division or distribution of these accumulated earnings. The effect of a pure stock split, in this regard, is roughly analogous to that occurring in a corporate merger. For example, in Buist's Estate, 297 Pa. 537, 542, Justice Kephart stated:

". . . it is apparent that a merger of the two corporations cannot be considered as a sale of their property by the constituent companies, and the issuance of the new capital stock is merely the issuance of new evidence of ownership to the shareholders. Accepting shares of stock in the merged company is not tantamount to the distribution or division of assets which calls for an apportionment between a life tenant and remainderman." Similarly, the issuance of additional

stock certificates in a stock split is merely additional evidence of ownership to the shareholder, and acceptance of these additional shares by the trustees is not tantamount to a distribution or division of earnings to the trustees.

In addition to the theoretical difficulties discussed above, the practical consequences of declaring pure stock splits to be apportionable events are manifold, far reaching and must be considered. Stock splits have been in vogue with many corporations during the past decade and to date have not been treated by fiduciaries, beneficiaries and taxing authorities as being apportionable transactions. Were this tacit understanding to be eliminated, an accepted and reasonable rule would be swept away and along with it much of the stability of current trust administration.

The guardian ad litem and the contingent remaindermen also urge that a pure stock split is not an apportionable event for the additional reason that the Principal and Income Act of July 3, 1947, P. L. 1283, is applicable and prohibits same. Section 3(2) of the act provides: "All receipts of money or other property paid or delivered . . . as a refund or replacement or change in form of principal, shall be deemed principal, unless otherwise expressly provided in this Act." Retroactive application of this statute was declared to be unconstitutional in Crawford Estate, 362 Pa. 458. It is the position of the guardian ad litem and remaindermen, however, that the act is unconstitutional in its retroactive effect only when it destroys vested property rights and that vested property rights exist only where the case law in the field has clearly established the income beneficiaries' right to an apportionment of a particular transaction. Therefore, in the absence of any ruling that a stock split constitutes an apportionable event, no vested property right to an apportionment of the stock split exists in the income

beneficiary. However, in light of the disposition herein made of the arguments of the income beneficiary concerning the apportionment of a stock split, it becomes unnecessary to rule and I hereby express no views concerning the constitutionality of the application of the Principal and Income Act of 1947 to the present transaction.

The income beneficiary has argued in the alternative that if a stock split does not in itself give rise to an apportionment, the 1954 Sun Oil transaction should be apportionable because it was in essence a stock dividend.

"The feature that distinguishes a stock dividend from a split-up 'is the permanent retention of earnings in the business through formal transfer of earned surplus, legally available for dividends, to capital account.' (Paton, Accountant's Handbook, 3d Ed., p. 1016)": In re Lissberger's Estate, 71 N. Y. S. 2d 585, 586.

"The effect of a stock dividend is to transfer from the plenary control of the corporation to the control of the stockholders the surplus or undistributed profits against which the new stock is issued": Soles v. Granger, 174 F. 2d 407, 410, footnote 10.

A stock dividend, therefore, requires a capitalization of earnings, and the income beneficiary argues that such capitalization of earnings does exist in the present transaction. He points out that since the inception of this trust the Sun Oil Company has followed a policy of declaring and issuing annual stock dividends of varying amounts, not, however, exceeding 10 percent of the shares issued and outstanding at the time of such dividend. Up until 1954 these stock dividends were issued in every year except 1938, 1939, 1942, 1943, 1946 and 1954. During the years prior to 1948 there was, incident to each such stock dividend charged against earned surplus and debited to capital stock

account, an amount approximately equal to "capital value," which, in turn, was in an amount less than the book value, and also less than the market value of the additional stock. In 1948, new regulations of the New York Stock Exchange changed the amount of earned surplus required to be capitalized upon the issuance of stock dividends from "capital value" to "fair value", an amount closely equated to market value and, with regard to Sun Oil Company stock, substantially in excess of book value. As a result of complying with these regulations, by 1954 the capitalization of earnings for stock dividends in the years 1947 to 1953 was far in excess of book value, and the capital account did, at the time of the 1954 stock distribution, contain "excess" or "unused" capitalized earnings. The income beneficiary proposes that these "excess" capitalized earnings be related to the present stock distribution. These previously capitalized earnings plus the present stock distribution, argues the income beneficiary, are tantamount to a stock dividend, and the transaction is therefore an apportionable one.

The relating of prior capitalizations of earned surplus to the apportionment of a stock distribution in a subsequent year has occurred in previous cases, urges the income beneficiary, who points to Fownes Trust, 3 D. & C. 2d 637, as an example. In that case the apportionment of Standard Oil (New Jersey) Company's recapitalization of June 12, 1951, was considered. The Standard Oil changed its capitalization from 35,000,000 authorized shares of $25 par value to 70,000,000 shares at $15 par value and issued two new shares for each of the old shares. To provide for the additional aggregate par value of its stock the Standard Oil transferred the necessary amount to "capital stock" account from "capital surplus" and "earned surplus" accounts. This "capital surplus" account, in turn, represented accumulated earnings which

had been transferred to "capital surplus" on a prior occasion incident to issuance of stock dividends. No further facts are disclosed in the opinion, however, as to the basis for capitalizing these prior stock dividends, i.e., capital value, book value or fair value, or market value; and, if, for example, book value had been used, no explanation is given for, in effect, using the earnings in "capital surplus" for double duty in supporting two stock distributions to income. However, in this Standard Oil transaction a transfer to "capital stock" was made at the time of the recapitalization, and the court considered the transaction to be an apportionable one. No such transfer, however, took place at the time of the 1954 Sun Oil transaction.

The income beneficiary has also cited Soles v. Granger, 174 F. 2d 407, as authority for relating prior capitalization of earnings to a subsequent stock distribution. In that case the board of directors of the corporation involved, on August 5, 1937, proposed a 250 for 1 stock split and, on the same date, transferred a substantial amount from earned surplus account to capital account. On October 5, 1937, the shares of the corporation were split 250 for 1 upon subsequent approval by the stockholders of the August 5 proposal of the directors. Since the capitalization of earnings and the proposal for a split both occurred on the same day, it was only logical for the circuit court to treat the transaction as a whole and to declare it as being a stock dividend. The factual discrepancy between that transaction and the Sun Oil 1954 transaction is apparent. In both of the above cited cases there was some connection between the capitalization of earnings and the distribution of additional stock. However, no such tie-up appears in the present case.

Finally, the income beneficiary has referred to Cunningham Estate, supra, in which adjudication Judge Saylor (affirmed by the court en banc, 13 D. & C.

2d 63) made a thorough and detailed analysis of the apportionability of a General Electric Corporation transaction in which the corporation issued three shares of new common stock at a par value of $5 each for each outstanding share of common no par stock of stated value of $6.25. The additionally created par value was supported by "earnings theretofore held in the earned surplus account." Looking through the form to the fact of the transaction, Judge Saylor treated the distribution as a stock dividend, for apportionment purposes, to the extent supported by capitalization of earnings. He stated: "The only basis for the determination of apportionability must be an examination of what the transaction in fact was and what it has done to earnings in capital account;" and at page 14, "the reference to 'stock dividend' in the opinions of the Supreme Court is not to be interpreted as a mandate that there must be a transaction which is exclusively a stock dividend. Rather the listing of the apportionable events by the Supreme Court employs the words 'stock dividend' as a brief way of stating that when new stock is issued to existing stockholders and the new stock is supported by a capitalization of earnings, that to the extent of such capitalization of earnings, there is an apportionable event. *To the extent that the new shares are supported by already existing capital, there is no apportionment.*" (Italics supplied.)

Unlike the General Electric stock distribution the present Sun Oil 1954 transaction involved no capitalization of earnings, and in absence of such capitalization cannot be treated as a stock dividend. Capitalization of earnings had occurred in the past, but these transactions had no connection with the present and must stand by themselves. If "over" capitalizations occurred because of compliance with the rules of the New York Stock Exchange or for any other reason, they cannot now be exhumed and used to alter the na-

ture of a subsequent independent transaction. It may be true that earnings in the past were "over" capitalized. The point is, however, that they were in fact capitalized and formed a part of *existing capital* which could not be used to transform the present stock split into an apportionable stock dividend.

This is not to say that these "over" capitalized earnings are forever locked up and put beyond the reach of the income beneficiary. If, for example, a sale of the stock in question has been made by the trustee, these earnings will be made available to him regardless of where the earnings appear in the corporation's books. See Estate of Alex. J. Cassatt, 105 Pa. Superior Ct. 14. However, in absence of such a sale or occurrence of other recognized and established apportionable event, the income beneficiary is not entitled to the accumulated earnings of this corporation. Not only is this conclusion supported by the existent law on the subject, but also by the accepted and workable practice of present trust administration. Trustees upon the receipt of every stock split cannot and should not be expected to engage in an historical analysis of the accounting procedures of the corporations involved to determine, if ever, since the creation of the trust, there has been an "over" capitalization of earnings which might transform what is plainly a stock split into an apportionable stock dividend. The time has come when the law of apportionment in Pennsylvania prior to the Acts of 1945 and 1947 has become so complicated and difficult of practical application as to be almost ludicrous. Some consideration should be given the harassed trustee in his plea for a rule that is equitable yet moderately easy to apply.

While recognizing that economic arguments are unavailing if the law is clear, the court should not ignore such economic considerations when it is called upon to determine matters in an area in which the law is

unsettled. The briefs of counsel presented quantities of impressive material on these aspects of the case which is difficult to analyze briefly beyond saying that it tends to show that even the settled apportionment rules in the standard situations work against remainder beneficiaries in a serious way during inflationary trends in the economy. In short, so it is argued, preservation in today's dollars of an intact value established in the dollars of many years ago puts the remainderman at a definite disadvantage. Such economic considerations are even more important now that common stock investments are so widely used by trusts and since 1949 are authorized investments even in pre-existing trusts. As indicated, these are merely passing observations in situations where there is a clear rule of law, but they should not be lightly dismissed when the court is asked to extend occasions for apportionment in a new situation such as that of the stock split now before the court.

Finally, as a third alternative argument, the income beneficiary submits that in any event, 3,331.24 shares out of the 1954 distribution should be apportioned to him, the book value of such shares being equivalent to the difference between the total actual transfers from earnings to capital in the years 1947 to 1953 and the book value of the stock dividends issued in those years. The income beneficiary relies on Estate of Alex. J. Cassatt, supra, to support his position, where, upon the sale of the stock by the trustees, it was held that in computing the amount of the sales proceeds to be distributed to income as attributable to accumulated earnings, earnings which had been capitalized previously were to be included. However, in Estate of Alex. J. Cassatt, supra, it was the sale of the stock by the trustees that constituted the occasion for the apportionment, not the previous capitalization of earnings. As noted above, the 1954 Sun Oil transaction did not

constitute an apportionable event, and to date no sale of the entire block of stock by the trustees has occurred. As the shares are sold, the holding of Estate of Alex. J. Cassatt, becomes apposite.

Accordingly, the first objection of the income beneficiary is hereby dismissed.

The second objection of the income beneficiary complains that the trustees failed to apportion the proceeds of sales of 3,179 shares of common stock of Sun Oil Company which were sold between August 30, 1949, and July 22, 1955. The pertinent facts are as follows:

At various times from 1949 to 1955 sales of Sun Oil Company stock were made totaling 3,179 shares. These sales produced a total net revenue of $221,027.71, all of which proceeds were allocated to principal. Of the shares so sold, 3,000 sold during 1955 were of the 6,359.75 shares received as the stock split of December 1954. The sale of these 3,000 shares produced a net amount of $210,645.71. The remaining 179 shares sold on August 30, 1949, were part of the 1,618 shares retained in principal from the 5,280 shares received on January 30, 1948, as a stock dividend.

The income beneficiary objects to the award of the entire $221,027.71 proceeds to principal. He asks that an apportionment of the proceeds be made and that the amount of such proceeds represented by the undistributed earnings of the Sun Oil Company accumulated from the creation of the trust until the date of sale as applicable to the shares sold be awarded to income. It is well settled that the sale of stock by the trustee is an occasion for apportionment and that the earnings of the corporation accumulated since the creation of the trust should be awarded to income, assuming of course that the apportionment would not impair intact value: Buist's Estate, 297 Pa. 537, Nirdlinger's Estate, 290 Pa. 457. In paragraph 9 of

the stipulation the parties have agreed that "the proceeds of sale of the aforesaid shares, which proceeds exceed the intact value thereof, fully reflected the accumulated and distributed earnings of Sun Oil Company applicable to said shares and in addition thereto reflected market appreciation." The proceeds of the sale of stock, therefore, should be apportioned, and the guardian and the parties are directed to file computations of their recommendations for the apportionment of said proceeds.

Accordingly the second objection of the income beneficiary is hereby sustained.

Concerning the objections of the guardian, the account indicates that certain loans without security were made to the income beneficiary in 1955, namely cash totaling $210,645.71 and stock value at $50,972.80. These loans are authorized neither by the terms of the trust instrument nor by the controlling statute, the Fiduciaries Investment Act of May 26, 1949, P. L. 1828. The trustees, therefore, are directed: (1) To withhold all distributions due the income beneficiary as a result of the apportionment directed in this opinion; (2) to secure immediate adequate security from the income beneficiary for the amount of these loans, and (3) within 90 days of final confirmation of this adjudication to collect the cash advanced and the shares of stock loaned. Accordingly the objection of the guardian is hereby sustained. . . .

And now, March 27, 1958, this adjudication is confirmed nisi.

*Henry A. Frye* and *Franklin C. Hutchinson*, for accountants.

*D. Stewart McElhone, Oscar M. Hansen, Vernon L. Stover, Samuel W. Morris, John Russell, Jr.,* and *Morgan, Lewis & Bockius*, for income beneficiary and exceptant.

*H. Ober Hess, Bruce L. Castor, Norman H. Brown* and *Ballard, Spahr, Andrews & Ingersoll,* for adult contingent remaindermen.

*M. Paul Smith,* for guardian and trustee ad litem.

TAXIS, P. J., July 2, 1958.—Arthur E. Pew, Jr., income beneficiary, and the trustees for Arthur E. Pew, Jr., have filed exceptions to the adjudication dated March 27, 1958.

The trustees and the income beneficiary both complain that the auditing judge erred in concluding that certain loans, without security, were made to the income beneficiary which were unauthorized. The auditing judge directed the trustees to: (1) Withhold all distributions to the income beneficiary as a result of the apportionment directed in the adjudication; (2) to secure immediate and adequate security from the income beneficiary for the amount of these loans, and (3) within 90 days of final confirmation of the adjudication to collect the cash advanced and the shares of stock loaned. The loans made to the income beneficiary in 1955, in cash, totaled $210,645.31, and in stock valued at $50,972.80. The auditing judge concluded that these loans were neither authorized by the terms of the trust nor by the Fiduciaries Investment Act of 1949.

At argument on these exceptions trustees and the income beneficiary submitted a "Stipulation as to loans by trustees to the income beneficiary". This stipulation was joined in by all parties in interest and the purport of it is a compliance with the directions just set forth in the adjudication by liquidation of the loans. The suggested plan of liquidation of the loans as spelled out in the stipulation is by a plan different from that as contemplated in the adjudication. Briefly summarized, the plan suggested by the parties to pay these loans calls for the income beneficiary to (1) return

20

to the trustees 3,000 shares of common stock of Sun Oil Company loaned by the trustees, and (2) the income beneficiary is to secure the cash loans in a reduced amount of $156,925.14 by pledging with the trustees a note of American Moulding Corporation in the amount of $216,793, such pledge providing that all payments on account of the principal of the note to be applied to reduce said loan. The suggested plan of liquidation of these loans, although different from that as set out in the adjudication, is satisfactory to the court, the same is hereby approved and the adjudication is modified by striking from the adjudication the necessity for the trustees to acquire from the income beneficiary security other than the note and stock as set out. The trustees have advised the court, on June 11, 1958, as follows:

"This is to inform your Honor, pursuant to stipulation of counsel handed up on June 9th, that the above named trustees have received from Arthur E. Pew, Jr., 3000 shares of stock of Sun Oil Company loaned to him by the trustees and the duly endorsed note of American Moulding Corporation payable to Arthur E. Pew, Jr., and dated April 1, 1958, and due January 2, 1960, in the principal sum of $216,793.00 as collateral security for loans of cash heretofore made by said trustees to the said Arthur E. Pew, Jr., and presently totalling $156,925.14, it being understood and agreed that all payments on account of the principal of said note shall be applied to reduce the aforesaid loans of cash."

The income beneficiary further complains that the court erred in concluding that the stock split involved in the present proceeding is not an apportionable event and, alternatively, in failing to conclude that it was not in essence a stock dividend. On this phase of the case it is conceded that the exceptions raise nothing not already argued extensively and fully considered

and determined in the adjudication. No good purpose would be served by repeating what has been fully set out in that adjudication.

The auditing judge in his adjudication said:

"The time has come when the law of apportionment in Pennsylvania prior to the Acts of 1945 and 1947 has became so complicated and difficult of practical application as to be almost ludicrous. Some consideration should be given the harassed trustee in his plea for a rule that is equitable yet moderately easy to apply."

Exceptant complains that this "inconvenience" to the trustees, as exceptant labels it, "is outweighed by the deprivation of the life tenant's rights." To begin with, it is "bootstrap logic" to so argue for the life tenant is *not* being deprived of his property. This type of stock arrangement has never been passed upon by our appellate courts. There is, therefore, no rule of property which gives an income beneficiary any vested rights in shares of stock acquired as a result of a stock split in circumstances disclosed by this record. The Supreme Court, as of this writing, has never so held, and the only known Pennsylvania decisions indicated that the receipt of such shares is not an apportionable event, that they belong to principal. Cf. Jones Estate, 377 Pa. 473; Frick Estate, 4 D. & C. 2d 247, 251; Thompson's Estate, 9 Pa. C. C. 639.

The plea "for a rule that is equitable yet moderately easy to apply" is not based on so superficial a foundation as mere inconvenience to trustees as the exceptant's argument would imply. There is inherent in this problem broad considerations of public policy involving trust administration. The application of the rule is concededly a most difficult and intricate branch of the law (King Estate, 349 Pa. 27, 29; Arrott Estate, 383 Pa. 228, 230), which generates such confusion as to visit on life tenant and remaindermen as well as the trustee injury brought about by delays, added costs,

often unnecessary taxes, uncertainties and, in many cases, vexing and costly litigation. A rule so difficult to apply does a disservice to all.

The income beneficiary's exceptions no. 13 and no. 14 complain that the fees awarded to the guardian ad litem and to the accountants were directed to be paid out of cash income. The more equitable distribution of these fees would seem to be that they be borne half by principal and half by income. These exceptions are sustained and the adjudication modified to direct that these two fees be borne half by principal and half by income. . . .

And now, July 2, 1958, the adjudication of March 27, 1958, as modified by this opinion, is confirmed absolutely.